377 P.2d 309

Application of TRICO ELECTRIC COOP-
ERATIVE, INC., a corporation, and Corona
De Tucson, Inc., a corporation, for an Order
Approving a Proposed Contract Between
Corona De Tucson, Inc., and Trico Electric
Cooperative, Inc., for the Distribution of
Electrical Energy in Portions of Township
17 South, Range 15 East and Township 17
South, Range 16 East, in Pima County,
State of Arizona.

CORONA DE TUCSON, INC., a corporation,
and Trico Electric Cooperative, Inc.,
a corporation, Petitioners,

v.

George "Duke" SENNER, E. T. "Eddie" Wil-
liams, Jr., and Jack Buzard, in Their Of-
ficial Capacity Only as Members of and Con-
stituting the Arizona Corporation Commis-
sion, Respondents.

No. 7698.

Supreme Court of Arizona.

En Banc.

Dec. 19, 1962.

Anderson & Welker, and Dudley S. Welker, Safford, for amici curiae Graham County Electric Cooperative, Inc., and Duncan Valley Electric Cooperative, Inc.

Hall, Jones, Hannah & Trachta, and Russell E. Jones, Tucson, for amicus curiae Mohave Electric Cooperative, Inc.

Robert Pickrell, Atty. Gen., Jos. S. Jenckes, V., Frank Sagarino, Asst. Atty. Gen., for Arizona Corporation Commission, respondents.

Wolfe, Greer & Knez, Tucson, for petitioner Trico Electric Cooperative, Inc.

Thomas B. Hargis, Jr., Tucson, for petitioner Corona de Tucson, Inc.

Jennings, Strouss, Salmon & Trask, and Thomas J. Trimble, and Clarence J. Duncan, Phoenix, and Darnell, Holesapple, McFall & Spaid, and A. Y. Holesapple, and Clifford R. McFall, Tucson, for intervenor.

YALE McFATE, Superior Court Judge.

This proceeding was commenced on August 6, 1962, by the filing in this Court of a petition for an alternative writ of mandamus, directed to the respondents as members of and constituting the Arizona Corporation Commission, requiring them to approve or show cause why they should not approve, a certain contract between Corona de Tucson, Inc. (herein called Corona), and Trico Electric Cooperative, Inc. (herein called Trico), for the furnishing of electrical energy.

Tucson Gas, Electric Light & Power Company (herein called Tucson Gas) was permitted to intervene, and after hearing, we granted the alternative writ.

Respondents and intervenors urge the Court to dismiss the proceedings and quash the writ on the ground that mandamus is improper in this case, because (1) the law does not specifically impose a duty on the Corporation Commission to approve the terms of the Trico-Corona contract, (2) there is a plain, adequate and speedy remedy at law, and (3) the Commission acts judicially and within its jurisdiction in determining whether the contract shall be approved.

At the hearing on the original application, August 10, 1962, the respondent Com-

mission represented to the Court that it had, on that day, made and entered two certain orders as follows: (1) it disapproved the proposed Trico-Corona contract; (2) in a consolidated proceeding pending before the Commission involving conflicting applications of Trico and Tucson Gas, it established by metes and bounds the respective operating areas of each, had issued to each an amended certificate of convenience and necessity and that the territory involved in the Trico-Corona contract had been awarded to Tucson Gas. This order was the basis for rejecting the Trico-Corona contract, the territory to be served under that contract being within the boundaries of the newly awarded amended certificate of Tucson Gas.

■ Trico has raised the point, of which we take passing notice, that the Commission had no jurisdiction to enter these orders after this Court has assumed jurisdiction over this proceeding. If the effect of either of such orders is to defeat or usurp the jurisdiction of this Court, or to render any judgment to be entered by this Court nugatory, such order would be void. Whitfield Transportation, Inc. v. Brooks, 81 Ariz. 136, 302 P.2d 526. In view of the conclusions arrived at later in this opinion, it will be unnecessary to discuss the application of the rule to the facts of this case.

■ After the filing of the original petition in this Court and prior to a hearing thereof on August 10, 1962, Tucson Gas hastily constructed over three miles of distribution lines into the northern portion of the area proposed to be served under the Trico-Corona contract, and along the west line of the section in which Trico's distribution lines terminated. Assuredly, it acquired no new operating rights by such tactics and in event of decision herein adverse to Tucson Gas, may ultimately be required to remove the lines.

The determinative questions here presented are:

(1) Was the Commission under a duty to give effect to the Trico-Corona contract, and if so, is Trico entitled to relief by way of mandamus?

(2) The answer to (1) will depend in part on the question of whether the Commission in entering its order of August 10, 1962, certificating to Tucson Gas the territory to be served under the proposed Trico-Corona contract exceeded its jurisdiction. If it did not, then its decision disapproving the contract, whether right or wrong, could not be questioned by mandamus in this proceeding.

These problems will be dealt with in reverse order. First, did the Corporation Commission have jurisdiction to make its order of August 10, 1962, and to include within the territory described in the amended certificate of Tucson Gas, the area designated as Madera-Corona land? It

is necessary to understand the background of events which led to the present litigation. Much of that background is set forth in Trico Electric Cooperative, Inc. v. Corporation Commission, 86 Ariz. 27, 339 P.2d 1046, hereinafter referred to as the "Trico case". Trico is a domestic corporation which was organized in October, 1945, to operate as a non-stock, non-profit, electric cooperative. Under its original charter it could sell and distribute electricity only to its members. Tucson Gas is a privately owned public electric utility duly certified by the Corporation Commission and operates (principally) in Tucson and vicinity. Trico is a public service corporation (see Trico case, supra) and has been granted a certificate of public convenience and necessity by the Arizona Corporation Commission to serve its members in the rural areas of Pima, Pinal and Santa Cruz counties, with the restriction that it may not serve any member within one-half mile of the lines of any other distributor of electricity which were constructed prior to those of Trico without first obtaining authority from the Commission. It will be noted that neither the certificate of Trico nor the certificate of Tucson Gas delineates a definitive territory. The former refers to "area", the latter to "vicinity" in describing area of operation.

In November, 1959, a few months after the decision in the "Trico case" became final, Trico applied to the Corporation Commission "for an order delineating the boundaries of its existing certificate of convenience and necessity by metes and bounds in portions of Pima, Pinal and Santa Cruz counties". While this application was pending and in March, 1960, Tucson Gas petitioned the Commission to amend its certificate in Pima County. The Commission ordered both applications consolidated for hearings, which were held in September, 1960, and May and October, 1961.

In September, 1961, Trico amended its Articles of Incorporation to remove the limitation therein with respect to service to its members only. Trico thereupon moved to amend its application and its certificate so that it might serve without regard to membership in the territory which it sought to have delineated. The Commission, after extended hearings, took the matter under advisement in January, 1962, and on August 10, 1962, after this mandamus proceeding was filed, issued its decision and order. By its order it granted to each applicant certain designated territory, by a metes and bounds description, and removed the limitation on Trico's certificate respecting service to members only.

Prior to the entry of the aforementioned orders and about May of 1962, Corona became a member of Trico and a contract was negotiated between them for extension of electrical service to several sections of land in a designated rural area which Corona was undertaking to subdivide and develop into

residence properties for purpose of sale. This contract complied with the rates on file and approved by the Commission. The land involved was owned or leased by Corona and comprised a portion of a much larger area (herein referred to as Madera-Corona area) in which Trico had built a distribution line representing a substantial investment. Trico had established service therefrom to a small number of customers for whom it had been rendering service since 1956. Trico was authorized to serve the area in question under its certificate. Tucson Gas had no service lines in that area.

On May 9, 1962, respondent Commission issued a letter to both Trico and Tucson Gas stating that, among other things, Trico should not serve or contract to serve Corona without first obtaining consent and approval of the Commission. Whereupon Trico made formal application to the Commission for approval of the proposed contract.

Corona cannot proceed with its development program without electric power for construction and domestic purposes. Its fixed charges, interest and salary expense are estimated by it to be $300.00 per day, and delay in securing electric power will impose great loss and hardship upon Corona.

In the consolidated applications which culminated in the order of August 10, 1962, Trico requested that its existing territorial operating area be delineated by metes and bounds. Trico did not request additional territory—only that the Commission outline what it already had. Tucson Gas sought a substantial enlargement of its certificated area, which overlapped in many areas the territory being then served by and under certificate to Trico. The Commission could have granted Trico's request to delineate its existing boundaries and likewise could have awarded to Tucson Gas appropriate additional territory not being served where public convenience and necessity existed. However, it did neither. It deprived Trico of the right to extend service in the Madera-Corona area along its existing distribution lines and awarded that area to Tucson Gas, apparently under the theory that it could, in that proceeding, without appropriate notice and other procedural requirements, readjust existing boundaries and reapportion existing operating territory, to effect more congruous areas, for future operation and expansion of the respective companies. In doing so it erred and exceeded its jurisdiction.

■■ In the performance of its duties with respect to public service corporations the Commission acts as an agency of the State. By the issuance of a certificate of convenience and necessity to a public service corporation the State in effect contracts that if the certificate holder will make adequate investment and render competent and adequate service, he may have the privilege

of a monopoly as against any other private utility. Trico's right to maintain its distribution lines in the area of its certificate, and to make extensions therefrom to customers resulting from the development of the area served by it, is a vested property right, protected by Article 2, Section 17, of the Arizona Constitution, A.R.S. City of Tucson v. Polar Water Co., 76 Ariz. 404, 265 P.2d 773.

■ Quite aside from statutory requirements the rescission or revocation of all or a portion of a certificate of public convenience and necessity requires strict compliance with the procedural prerequisites of notice and hearing. The Commission's power to grant, amend or cancel certificates of convenience and necessity is limited to that expressly granted by the Constitution and laws of Arizona.

Section 40–252, Arizona Revised Statutes, provides in part:

"The Commission may at any time, *upon notice to the corporation affected, and after opportunity to be heard* as upon a complaint, rescind, alter or amend any order or decision made by it. * * *."

■ In the consolidated applications which preceded the order complained of, no issue was tendered or made as to whether Trico's certificate should be amended areawise. Consequently, that issue was not before the Commission, and it had no jurisdiction to delete an area then being served by Trico from its certificate of convenience and necessity.

■ The Commission and Tucson Gas in their response to the writ rely heavily on the proposition of judicial estoppel, contending that counsel for Trico urged the Commission to enter the type of order it entered, and that Trico is now judicially estopped from taking a contrary position. The principle is stated as follows, in 31 C.J.S. Estoppel § 119, P. 381:

"As a general rule, a party who has assumed a particular position in a judicial proceeding is estopped to assume an inconsistent position in a subsequent proceeding involving the same parties and questions."

The doctrine of estoppel in judicial proceedings is recognized in Adams v. Bear, 87 Ariz. 288, 350 P.2d 751; Martin v. Wood, 71 Ariz. 457, 229 P.2d 710, and Rossi v. Hammons, 34 Ariz. 95, 268 P. 181.

■ The record discloses that counsel for Trico time and again urged the Commission to establish a boundary between the two utilities, assured the Commission it had jurisdiction so to do, and conceded that in doing so, if duplication of service existed in a particular area, the Commission could lawfully require one utility to purchase the duplicated facilities of the other, but was

careful to qualify this latter concession by such statements as "That of course, would depend on the degree of modification" and "If you do something reasonable we can live with it". Since the Commission made no order requiring purchase of lines by either company there is no basis for applying estoppel in respect to any order of that nature. Counsel's statements should be appraised in light of the evidence, which established that throughout the entire system there was very little actual duplication of service facilities. There was none whatever in the area in question in these proceedings. Each company maintained a few transmission lines across territory of the other to serve commercial and other large consumers, but there were no service connections between the termini of these lines and they were maintained solely for transmission purposes, hence they should not be considered as electric service duplication. Assuming that statements of Trico's counsel quoted by the Commission and Tucson Gas could have been interpreted as committing Trico to the proposition that the Commission could or should, in establishing a division of territory, take from one and give to the other and vice versa, other statements made by same counsel should have cleared up any misapprehension.

At the hearings in May of 1961, counsel told the Commission:

"By T. G. & E.'s application, you are apprised of what they want in regards to an amended certificate. We have shown in our motion to dismiss that they do not at the present time have distribution lines, facilities in those areas where Trico is serving, and in which Trico previously presented its maps showing where it was serving in the request for delineation of boundaries. Therefore, we think you should give careful consideration to this motion to dismiss, because you might be conducting a useless hearing on the part of T. G. & E.'s application for an amended certificate, because first you must determine is there anybody else certificated there, and we must be apprised—Trico's certificate is there, you must be apprised of any allegations that we are not satisfactorily performing there. And I don't believe the Corporation Commission has any matters of that sort before it at this time.

"The cart is certainty coming before the horse in this case as far as their application is concerned."

Toward the end of the transcript of evidence we find this:

"MR. DUNCAN: My point was this, counsel has sought to have a delineation of boundaries and an exclusive area, but he continues to say from time to time this business about: You cannot take the territory away from us

without holding a particular hearing, finding that we are not serving it, and then disenfranchising it before you give it to someone else. I simply wanted to lay the point at rest so we may not hear from him in some subsequent appeal if the Commission decides to divide the territories up and so that the Commission again was without authority and could only divide it as he prayed for and in no other way.

"MR. WOLFE: You will hear from us in subsequent appeals if the thing isn't done according to law, and if it isn't fair and reasonable, if it exceeds the authority of this jurisdiction, you can bet your boots on that.

\*    \*    \*    \*    \*    \*

"COM. SENNER: Do you think we have jurisdiction to draw a boundary that is reasonable and fair wherever it may be?

"MR. WOLFE: I think you have jurisdiction to delineate Trico's certificate. I said so in the first instance, and I say so now, I said so when we filed.

"COM. SENNER: Thank you."

In closing arguments before the Commission counsel for Trico pointed out five possible decisions which the Commission could make. He stated "When I give you these conceivable rulings, *all but one is given without regard to the legality of making*

*such rulings."* The conceivable rulings were (1) to deny both applications; (2) to deny Trico's application and grant the application of Tucson Gas; (3) to grant both applications; (4) to grant both applications, but modify both; and (5) to grant Trico's application, deny the application of Tucson Gas as to the contested area, and grant it as to the uncontested area. He argued strenuously against the Commission making any of the first four types of decisions. As to (5), he prefaced his remarks as follows: "Let me give you the solution which is in accord with law and in accord with the facts that you have before you."

Assuming that the remarks of counsel for Trico on the subject were in fact ambiguous or inconsistent, in applying the doctrine of estoppel, the Commission should not have selected those statements which were against its interest and ignored those in its favor. This is especially so where the whole theory of Trico's application, carefully explained in argument by its counsel, is contrary to the few statements culled out of context from several thousand pages of record and presented to the Court by respondents and intervenors in their brief.

We hold the doctrine of estoppel does not apply to the facts of this case.

The Commission and Tucson Gas have advanced a further proposition which may be summarized as follows: When Trico filed its application for delineation of its

boundaries it was certificated to serve and undertook to serve only its members and not the general public. Therefore, Trico was not a "public utility" and, consequently, could not have an *exclusive* service area entitled to protection as a property right under Article 2, Section 17, Arizona Constitution. Tucson Gas, on the other hand, was required to serve the general public within the area of its certificate and was authorized under Section 40–281, subd. B, Arizona Revised Statutes, to extend its lines into contiguous areas not theretofore served by a public utility of like character. It is contended, therefore, that an electric cooperative which is not a public utility has no right to claim territorial integrity and freedom from competition as to non-members, and that any injury from such competition is *damnum absque injuria*. Hence, they maintain the Commission had jurisdiction to make an order granting the Madera-Corona area exclusively to Tucson Gas and preventing expansion of Trico lines in that area.

In the Trico case, supra, decided by this Court in 1959, we said:

"Trico next complains that it is prohibited from duplicating existing electrical facilities when there is no such order outstanding as to any other utility duplicating Trico. The answer is that it is implicit in the principle of regulated monopolies that duplication of services is prohibited. Any restrictions, however, imposed upon any other parties to this action would have been wholly outside the issues of this case and pure dictum. Whether Tucson Gas or Citizens may duplicate Trico's lines will undoubtedly be decided by the Commission when the issue is presented to it."

Whether this Court will apply the principle of regulated monopoly in favor of Trico is now squarely presented for decision.

Numerous cases have been cited in support of the proposition that a privately owned public utility may compete freely with an electric cooperative serving only its members because the latter has no "exclusive service rights". Sheridan County Electric Co-op., Inc. v. Montana-Dakota Utilities Co., 128 Mont. 84, 270 P.2d 742; San Miguel Power Ass'n v. Public Service Commission, 4 Utah 2d 252, 292 P.2d 511; Socorro Electric Cooperative, Inc. v. Public Service Company of New Mexico, 66 N.M. 343, 348 P.2d 88; Clearwater Power Company v. Washington Water Power Co., 78 Idaho 150, 299 P.2d 484; Wattsburg Telephone Cooperative Ass'n v. Pennsylvania Public Utility Commission, 182 Pa.Super. 594, 128 A.2d 160 (involving a cooperative telephone company); Black River Electric Cooperative, Inc. v. Public Service Commission, 238 S.C. 282, 120 S.E.2d 6.

These cases are from jurisdictions where cooperatives are not classified as public service corporations under local law nor are they permitted to hold certificates of public convenience and necessity, nor does the local public utility regulatory body have jurisdiction over them. In those circumstances it would logically follow that public service corporations may lawfully compete with them for customers. Cf. Public Service Co. v. Public Utilities Commission, 142 Colo. 135, 350 P.2d 543. Where co-op brought itself under jurisdiction of Commission to get a certificate of convenience and necessity.

■ In Arizona, however, the legal status of an electrical cooperative such as Trico is exactly the converse. We held in the Trico case, supra, that Trico *was a public service corporation,* that it *lawfully held a certificate of public convenience and necessity,* and that the *Commission did have jurisdiction* to regulate its service and rates, under Arizona Constitution, Article 15, Sections 2 and 3. In that case a distinction was noted between a "public service corporation" and a "public utility", on the basis that the latter is required to serve the public generally, whereas the former may be required to serve members only. The question before the Court in that case was whether Trico was entitled to serve "non-members". The question whether Trico could lawfully impose unreasonable restric-

tions on membership, or whether it was entitled to refuse membership to an applicant who complies with its by-laws was neither presented nor determined. Any intimation by the language therein employed to that effect, or to the effect that Trico is not a full-fledged public service corporation as defined in Constitution, Arizona, Article 15, Section 2, is purely dictum. Under our Constitution, all public utilities are classified as public service corporations, hence, any distinction between the two, as applied to the facts in this case, is meaningless.

■ It would inevitably follow, from our determination, that Trico was a public service corporation, that it is subject to all the burdens and entitled to all the benefits which apply to public service corporations generally. The term "public service corporation" implies service to the public. Having applied for and received from the State a certificate of public convenience and necessity, and having undertaken to serve thereunder, Trico may not arbitrarily refuse membership to an applicant who qualifies, nor may it discriminate between members as to service, nor place restrictions on membership inimical to its role as a public service corporation.

Arizona Constitution, Article 15, Section 12, provides:

"All charges made for service rendered, or to be rendered, by *public service corporations* within this State shall

be just and reasonable, and *no discrimination in charges, service, or facilities* shall be made between persons or places for rendering a like and contemporaneous service, \* \* \*." (Emphasis supplied.)

This principle is embodied in the provisions of Section 40–334, Arizona Revised Statutes:

"A *public service corporation* shall not, as to rates, charges, *service, facilities or in any other respect,* make or grant any preference or advantage to *any person or subject any person to any prejudice or disadvantage.*" (Emphasis supplied.)

In Town of Wickenburg v. Sabin, 68 Ariz. 75, 77, 200 P.2d 342, 343, we quoted with approval from McQuillin Municipal Corporations, 2d Ed. Vol. 4, § 1829, as follows:

"*A public service corporation* is impressed with the obligation of furnishing its service to each patron at the same price it makes to every other patron for the same or substantially the same or similar service. It 'must be equal in its dealings with all.' *It 'must treat the members of the general public alike.'*" (Emphasis supplied.)

In 56 A.L.R.2d 413, where the authorities are reviewed, it is there pointed out that the courts and regulatory bodies have frequently recognized that electric cooperatives organized to serve members only, at cost, and especially those organized pursuant to the Rural Electrification Act, 7 U.S.C.A. § 901 et seq., must extend service to those within the area of service who are willing to comply with the ordinary conditions as to membership as set forth in reasonable charter or by-law provisions.

It should be noted that Trico was organized prior to the enactment of, and is not governed by Section 10–751 et seq., Arizona Revised Statutes, relating to formation of electric cooperative non-profit membership corporations. Membership in Trico is extended to those applying therefor and paying a $5.00 membership fee. Membership is fully paid and non-assessable. (See Trico case, supra.) Trico has represented in these proceedings that it has never refused service to an applicant complying with these minimal membership requirements. In the Trico case, supra, it contended for the right to serve others than its members. In view of the Arizona Constitution and statutes above-referred to, the charter and by-laws of Trico, and the public nature of the business in which it is engaged, it is reasonably contemplated that the association extend nondiscriminatory service to the public. The members of Trico merely take the place of and share the role of both stockholders and customers of privately owned utilities. The money with which this cooperative is financed came from public funds under the Federal

act which provided for furnishing of electrical energy to persons in rural areas, meaning all persons desirous and capable of receiving the benefits. It would be contrary to the legislative intent that such funds be used for promotion of associations adopting exclusive and self-determinative rules for membership. Alabama Power Co. v. Cullman County Electric Membership Corp., 234 Ala. 396, 174 So. 866, adhered to, 235 Ala. 694, 178 So. 919; Hagans v. Excelsior Electric Membership Corp., 207 Ga. 53, 60 S.E.2d 162; Capital Electric Power Ass'n v. McGuffee, 226 Miss. 227, 83 So.2d 837, 84 So.2d 793, 56 A.L.R.2d 403; Bookhart v. Central Elec. Power Co-op, Inc., 219 S.C. 414, 65 S.E.2d 781; Meyers v. Lux, 76 S.D. 182, 75 N.W.2d 533; Re Harrison Rural Electrification Asso. (W. Va.), 24 P.U.R., N.S., 7.

■ We hold that the Corporation Commission was under a duty to Trico to protect it in the exclusive right to serve electricity in the region where it rendered service, under its certificate. The Commission was under duty to prohibit a private utility under its jurisdiction from competing in that area, unless, after notice and an opportunity to be heard, it shall have been made to appear that Trico failed or refused to render satisfactory and adequate service therein, at reasonable rates. Corporation Commission of Arizona v. Peoples Freight Line, 41 Ariz. 158, 16 P.2d 420.

We shall next face the question, should this Court, by mandamus, require approval of the Trico-Corona contract? As authority for its action in rejecting the contract, the Commission relies on Article 15, Section 3, of the Arizona Constitution, the material portion of which provides as follows:

"The Corporation Commission shall have full power to * * * and may prescribe the forms of contracts * * to be used by such [public service] corporations in transacting such business."

■ "Form", as used in the Constitutional provision, means "arrangement, especially orderly arrangement; the way that something is put together; pattern; style; *distinguished from content."* (See Webster's New 20th Cent. Dictionary, 2nd Ed.) Under this provision, the Corporation Commission may determine the outline, designate the arrangement of topics to be incorporated therein, specify their style or pattern, but no authority is therein delegated to prescribe the content, that is, the specific contractual provisions to be agreed upon.

The Corporation Commission is given broad constitutional and statutory powers over public service corporations, for example, the power to ascertain the fair value of their property, Constitution, Arizona, Article 15, Section 14, to determine

reasonable rates, Constitution, Arizona, Article 15, Section 3, Section 40–203, Arizona Revised Statutes, to require reports and prescribe the form and detail thereof, Section 40–204, Arizona Revised Statutes, to establish accounting systems, Section 40–221, Arizona Revised Statutes, to prescribe regulations for performance of any service or furnishing of any commodity, and in event of faulty or inadequate service, to prescribe what is just, reasonable, safe, proper, adequate or sufficient, and enforce its determination by order of regulation, Section 40–321, Arizona Revised Statutes, to prescribe just and reasonable standards, classifications, regulations, practices, measurements, or service to be furnished or followed by electric, gas and water corporations, Section 40–322, Arizona Revised Statutes.

No regulation or order of the Corporation Commission has been called to our attention and we are aware of none which prescribes the *form* of contract between an electric utility and a customer.

■ As we have seen, the contract was rejected by the Commission under the supposition that it involved an area of service outside the territory in which Trico was authorized to operate. Under our holding in respect to this point, it is obvious that the basis for the Commission's decision has been rendered untenable. The Commission found no other or valid reason to disapprove the contract. Consequently, Trico was entitled to have it approved.

■ In view of the foregoing, we deem it unnecessary to examine several points which respondent and intervenor have raised relating to the substance of the contract, except one point which goes to the basic rights of Trico to serve in a portion of the area in question. Our attention is called to the fact that the contract involved some 24 sections of land, only 13 of which were within the area requested by Trico in its application which had been submitted to the Commission for decision. Suffice it to say that none of the subject land was within one-half mile of any service line of Tucson Gas; that the entire development project proposed by Corona was within the rural areas of Pima County, and within a region which Trico was entitled to serve under the terms of its then existing certificate of convenience and necessity. If we assume, for the moment, that Trico had no right to serve in territory which it did not request in its application for delineation, it would nevertheless have a right to extend its service into territory contiguous to its requested boundaries, under the provisions of Section 40–281, Arizona Revised Statutes, the material portion of which reads as follows:

"A. (An) * * * electrical * * corporation shall not begin construction of a * * * line, plant or system, or

any extension thereof, without first having obtained from the commission a certificate of public convenience and necessity.

"B. This section shall not require such corporation to secure such a certificate for an extension * * * into territory * * * contiguous to its

* * * line, plant or system, and not theretofore served by a public service corporation of like character, or for an extension within or to territory already served by it, necessary in the ordinary course of business."

We see no merit to this point.

Section 12–2021, Arizona Revised Statutes, provides:

"A writ of mandamus may be issued * * * to any person, inferior tribunal, corporation or board * * * to compel, when there is not a plain, adequate and speedy remedy at law, performance of an act which the law specially imposes as a duty resulting from an office, trust or station, or *to compel the admission of a party to the use and enjoyment of a right* or office to which he is entitled and from which he is unlawfully precluded by such inferior tribunal, corporation, board or person." (Emphasis supplied.)

■ The Commission's action in disapproving the contract purported to preclude, unlawfully, the right which Trico had to enter into the contract. As specified in the foregoing statute, mandamus is appropriate to reinstate and assure to petitioner the right it had to the full use and enjoyment of its certificate of public convenience and necessity, which includes, of course, the right to enter into contracts with customers to provide electric service, pursuant to law and the existing rules and regulations of the Corporation Commission. Whitfield Transportation, Inc. v. Brooks, 81 Ariz. 136, 302 P.2d 526; State Board of Barber Examiners v. Walker, 67 Ariz. 156, 192 P.2d 723; Collins v. Krucker, 56 Ariz. 6, 104 P.2d 176; Board of Regents of University and State Colleges v. Frohmiller, 69 Ariz. 50, 208 P.2d 833.

■ Section 40–254 (F), Arizona Revised Statutes, expressly provides that writs of mandamus shall lie from the Supreme Court to the Corporation Commission in cases authorized by law. In view of the present urgent need of Corona for power, the serious financial loss it has suffered and will continue to suffer by reason of delay, the public aspect of the questions here presented, and the long and costly procedures inherent in the ordinary processes of appeal, there is no plain, speedy and adequate remedy at law (see Metropolitan Lines v. Brooks, 70 Ariz. 344, 220 P.2d 480). The remedy of mandamus is available to the petitioners, and the alternative

writ of mandamus, heretofore issued, for the reason set forth in this opinion, should be made peremptory.

BERNSTEIN, C. J., UDALL, V. C. J., and STRUCKMEYER and LOCKWOOD, JJ., concur.

NOTE: JENNINGS, J., having disqualified himself, the Honorable YALE McFATE, Judge of the Superior Court of Maricopa County, was called to sit in his stead and participate in the determination of this appeal.