644 P.2d 263

**The MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, a Colorado corporation, Plaintiff-Appellee,**

v.

**The ARIZONA CORPORATION COMMISSION, Defendant-Appellant,**

**and**

**Sears Roebuck and Company, Intervenor-Defendant-Appellant.**

No. 1 CA–CIV 5847.

Court of Appeals of Arizona, Division 1, Department B.

Feb. 2, 1982.

Rehearing Denied March 26, 1982.

Review Denied April 27, 1982.

Coleman M. Connolly, Denver, Joseph C. O'Neil and Fennemore, Craig, von Ammon & Udall by Calvin H. Udall, C. Webb Crockett, George T. Cole, Phoenix, for plaintiff-appellee.

Robert K. Corbin, Atty. Gen. by Thomas P. Prose, Asst. Atty. Gen., Phoenix, for defendant-appellant Arizona Corp. Commission.

Montgomery & Andrews, P. A. by Frank Andrews, III, Allen H. Brill, Santa Fe, N. M., and Gust, Rosenfeld, Divelbess & Henderson by James M. Koontz, Phoenix, for intervenor-defendant-appellant Sears Roebuck and Co.

## OPINION

JACOBSON, Presiding Judge.

The sole issue on this appeal is whether telephone terminal equipment[1] attached to service lines of Mountain States Telephone and Telegraph Company (the Company) is presently an integral part of the utility service furnished by the Company so as to subject rates charged for the use of such equipment to the jurisdiction of the Arizona Corporation Commission (Commission).

This action arose out of proceedings initiated by the Commission to reconsider its 1976 Decision No. 47561 (hereinafter referred to as the "1976 decision"). As a result of that inquiry, the Commission in

---

1. The term "terminal equipment" and "customer premises equipment" (CPE) refers to voice and message sending and receiving devices and ranges from a standard single line residential hand set to extremely complex automated call and message switching centers.

1980 issued Decision No. 51049 (hereinafter referred to as the "1980 decision") which, in part, rescinded the 1976 decision and ordered that the prices charged by the Company for certain terminal equipment and fixed by 1976 tariffs (Section 99 tariffs) shall remain in force and effect without change pending further order of the Commission. The Company sought judicial review of these two orders, basically contending that the Commission no longer had jurisdiction to fix the actual rates charged by the Company for terminal equipment. The trial court on January 21, 1981, entered judgment in favor of the Company, setting aside the two challenged orders. The Commission and Sears, Roebuck and Company (Sears) which was an intervenor before the Commission and a party to the trial court litigation have appealed.

In order to understand the ramifications of this controversy, it is necessary to set forth some historical background. From the time of statehood until 1968, a certificated telephone company was required as part of its public utility service obligation to provide its customers all of the terminal equipment necessary to use the telephone network. Conversely, during this period, it was improper for anyone, including the customer, to attach or use any terminal equipment not provided by the certificated telephone company. Thus, the Company in Arizona enjoyed a monopoly on supplying terminal equipment and the rates charged therefor were regulated by the Commission.

In 1968, this concept was drastically changed by the Federal Communication Commission (FCC) decision in *In the Matter of Carterfone*, 13 FCC 2d 420 (1968). At issue in *Carterfone*, was the validity of a tariff filed by American Telephone and Telegraph Company which provided in part:

No equipment, apparatus, circuit or device not furnished by the telephone company shall be attached to or connected with the facilities furnished by the telephone company, whether physically, by induction or otherwise.

*Carterfone* declared this tariff invalid as being "unreasonable, unlawful and unreasonably discriminatory under Sections 201(b) and 202(a) of the Communications Act of 1934, as amended."[2] 13 FCC 2d at 426.

*Carterfone* was followed by a series of federal judicial and administrative decisions which had the effect of introducing into the terminal equipment market competitors to the certificated telephone companies which competitors were unregulated by either the FCC or the Arizona Corporation Commission.

As a result of these developments the Commission entered its 1976 decision. The 1976 decision recognized that as a result of the *Carterfone* decision "many vendors and suppliers of communications terminal equipment, in addition to telephone companies, are now furnishing communications terminal equipment in Arizona." The decision further recognized that the Commission had no power to regulate or otherwise control the prices or conditions of service with respect to these independent vendors and suppliers. Based upon these recognitions, the Commission found that:

The existence of competition within the terminal equipment market insures that the users of terminal equipment will have a choice and that the price for this equipment will be governed by the presence of competition.

The 1976 decision thus ordered that the Company be required to set a "minimum level" for terminal equipment but it was

---

**2.** Although *Carterfone* held the "exclusive" attachment tariff invalid, it left for further consideration what devices a certificated telephone company could require between the terminal equipment not supplied by the telephone company and its connecting lines in order to assure the "integrity" of the entire system. This resulted in tariffs being filed with the FCC which required that customer connection of non-carri-

er supply terminal equipment to telephone lines be accomplished only if the customer effected the connection through a carrier-supplied connecting arrangement (CA) and employing a carrier-supplied network control signalling unit (NCSU). The legality of the abolishment of the CA and NCSU tariffs was considered in *North Carolina Utilities Commission v. FCC*, 552 F.2d 1036 (4th Cir. 1977).

further "authorized to set the actual charge for such equipment at or above such level on the basis of economic and market conditions." The net effect of the 1976 decision was that over and above the "minimum" rate, the Company was allowed to charge what the market would bear. The Company proceeded to operate under the "Section 99 tariffs" filed in connection with the 1976 decision.

The next important development in this field occurred when the Federal Communications Commission entered its order In The Matter of Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry), Docket No. 20828. The *Second Computer Inquiry* decision in essence found that competition in the terminal field existed; that this competition was publicly desirable; that the regulation of terminal equipment had a negative effect on competition and was harmful to the consuming public; and that terminal equipment "was a severable commodity from the provisions of transmission service." Based upon these findings, the *Second Computer Inquiry* decision ordered, effective March 1, 1982, that customer premise terminal equipment be completely deregulated and that this equipment be removed from the rate base structure.

The Commission's 1980 decision recognized that:

> ... as a practical matter, the implementation of the FCC decision in the *Second Computer Inquiry* will mean that the Commission may no longer be able to regulate, as they have in the past, the terminal equipment offerings of Mountain Bell. In view of the FCC decision ... and faced with the reality of competition in the terminal equipment field, the Commission concludes that terminal equipment offerings must be fully deregulated and subjected to the competitive forces of the free market.

However, the 1980 decision concluded that a period of time would be necessary to accomplish complete deregulation and that the March 1, 1982, date set by the FCC was a reasonable period to accomplish that re-

sult. In the meantime, the Commission was of the opinion that the "partial regulation" afforded by the 1976 decision was unlawful and that until March 1, 1982, the Commission had full authority to regulate the rates charged for terminal equipment.

Subsequent to the order to show cause issued by the Commission in this matter, but prior to its 1980 decision being rendered, the Company in fact filed new tariffs with the Commission affecting Section 99 tariff terminal equipment which was expected to produce approximately 22.5 million dollars additional annual revenue or an increase of approximately 1.875 million per month.

It is basically the Company's position, both before the trial court and on appeal, that where a public service company no longer enjoys a monopoly as to a service that it offers, the Commission lacks jurisdiction to regulate that service. Corollary to this position is a "federal preemption" argument that the state lacks authority to regulate terminal equipment at all. The Commission counters by contending that its 1980 decision is completely compatible with the federal preemption in this field, but more importantly, until complete federal preemption is effective (March 1, 1982) the Commission has a constitutionally granted power to regulate public service corporations, a status which the Company enjoys. In addition, intervenor Sears argues that the existence of competition in a given field does not prohibit the state from exercising authority to fix prices and that in any event the competition in the terminal equipment field is "flawed" and in reality non-existent, thus justifying continued exercise of Commission jurisdiction in the area.

■ We turn first to the Company's contention that by reason of *Second Computer Inquiry*, the Arizona Corporation Commission has lost jurisdiction to regulate terminal equipment based upon a federal supremacy preemption argument. This contention is based primarily upon two cases, *North Carolina Utilities Commission v. FCC*, 537 F.2d 787 (4th Cir. 1976), cert. denied, 429 U.S. 1027, 97 S.Ct. 651, 50

L.Ed.2d 631 (1976) (North Carolina I) and *North Carolina Utilities Commission v. F.C.C.*, 552 F.2d 1036 (4th Cir. 1977) (North Carolina II).

*North Carolina I* dealt with the issue of whether, in face of *Carterfone*, state regulatory commissions could prohibit the connection of customer supplied terminal equipment, except for a use exclusively concerned with *interstate* communications. In other words, could state commissions require carrier-supplied terminal equipment for *intrastate* communications? The court held that the intrastate use of terminal equipment was so inter-related with the interstate use of the same equipment that state control over intrastate use would frustrate the exercise of the plenary jurisdiction granted to the FCC over interstate and foreign communications by the Federal Communication Act of 1934. The holding in *North Carolina I* was that the Federal Communication Act of 1934 preempted state regulation of telephone terminal equipment used for both interstate and intrastate communication when such regulation *conflicts* with federal rules governing the same equipment. This holding was reaffirmed in *North Carolina II.*

The Company has failed to point out, however, how the Commission's 1980 decision conflicts with *Second Computer Inquiry.* In fact, the 1980 decision fully recognizes the ultimate preemptive effect of *Second Computer Inquiry* (deregulation and thus loss of Commission jurisdiction over terminal equipment as of March 1, 1982). However, *Second Computer Inquiry* is completely silent as to what jurisdiction state regulatory commissions may enjoy insofar as rate regulation is concerned, in the interim. Inferentially, because of the future termination date of regulation, the FCC has impliedly authorized state jurisdiction to be generally exercised in effectuating the changeover to a deregulated situation. The 1980 decision is completely consistent with this changeover policy.

■ While we agree that the legal conclusions in *Second Computer Inquiry* may be binding upon the Commission (for exam-

ple, the Commission could not find, contrary to the FCC's decision, that deregulation is not in the public interest), *Second Computer Inquiry* has not, simply by its rendition, completely ousted state jurisdiction in the field of terminal equipment regulation. We therefore hold that *Second Computer Inquiry* has not preempted state regulatory jurisdiction over carrier supplied terminal equipment.

The Company's main argument, however, is that regulatory jurisdiction by the Commission is predicated solely upon the monopolistic providing of the service regulated. Thus, if the monopoly disappears, regulation must also disappear.

The Company's argument that the jurisdiction of the Commission to regulate is derived from the power to grant a monopoly is founded upon language utilized by Arizona courts in characterizing the statutory scheme in Arizona. For example, in *Application of Trico Electric Cooperative, Inc.*, 92 Ariz. 373, 377 P.2d 309 (1962), the court stated:

> In the performance of its duties with respect to public service corporations the Commission acts as an agency of the State. By the issuance of a certificate of convenience and necessity to a public service corporation the State in effect contracts that if the certificate holder will make adequate investment and render competent and adequate service, *he may have the privilege of a monopoly as against any other private utility.* (Emphasis added).

92 Ariz. at 380–81, 377 P.2d at 315.

As to similar statements that Arizona operates under a "regulated monopoly" as to public service corporations, *see Corporation Commission v. Peoples Freight Line, Inc.*, 41 Ariz. 158, 16 P.2d 420 (1932); *Tucson Rapid Transit Co. v. Old Pueblo Transit Co.*, 79 Ariz. 327, 289 P.2d 406 (1955); *Trico Electric Cooperative, Inc. v. Corporation Commission*, 86 Ariz. 27, 339 P.2d 1046 (1959); *Arizona Corporation Commission v. Arizona Water Co.*, 111 Ariz. 74, 523 P.2d 505 (1974).

■ However, defining the rights that a public service corporation may enjoy in its certificated area against outside competition, does not answer the question of the *power* of the state (through the Commission) to impose regulation in the face of competition. To answer this question, we must determine which came first the chicken (the jurisdiction to regulate) or the egg (the granting of a monopolistic power). In this area we have no hesitancy in resolving this dilemma in favor of the chicken.

■ The jurisdiction of the Commission to regulate the rates charged by public service corporations in Arizona is derived from Art. 15, §§ 2 and 3 of the Arizona Constitution. Art. 15, § 2 provides in part:

All corporations other than municipal engaged . . . in transmitting messages or furnishing public telegraph or telephone service . . . shall be deemed public service corporations.

Art. 15, § 3 provides in part:

The Corporation Commission shall have full power to and shall, prescribe . . . just and reasonable rates and charges to be made and collected, by public service corporations within the State for service rendered therein . . . .

The constitutional provision which granted this authority and hence jurisdiction is silent as to any concepts of "regulated monopoly."

The concept of the regulated monopoly arose from the legislature in granting to the Commission the authority to issue certificates of convenience and necessity to public service corporations. Thus, the 1913 Code provided in § 2326(a) (R.S.1913) that:

No . . . telephone corporation . . . shall henceforth begin the construction . . . of a line, or plant or system . . . without first having obtained from the commission a certificate that the present or future public convenience and necessity require or will require such construction . . . .

\*    \*    \*    \*    \*    \*

[P]rovided, further, that if any public service corporation, in constructing or extending its line, plant or system, shall interfere or be about to interfere with the operation of the line, plant, or system of any other public service corporation, already constructed, the commission, on complaint of the public service corporation claiming to be injuriously affected, may, after hearing, make such order and prescribe such terms and conditions for the location of the lines, plants or systems affected as to it may seem just and reasonable.

That it is the legislative creation of certificates of convenience and necessity that gave rise to the concept of a "regulated monopoly" was made abundantly clear by *Corporation Commission v. Peoples Freight Lines, Inc., supra.* At issue in that case was whether the Commission could grant a certificate to a common carrier for a route which was already serviced by a certificated common carrier which was providing satisfactory service. The court defined the issue thusly:

On this state of facts was it unreasonable for the commission to find as a matter of law that public convenience and necessity required the issuance of a second certificate? The answer to that question will depend upon our decision as to what the public policy of the state of Arizona, as laid down in section 736, *supra*, [Section 736, Revised Code 1928, granting the Commission the authority to issue certificates of convenience and necessity] is in regard to common carriers by motor vehicles.

41 Ariz. at 164, 16 P.2d at 422.

The court begins its discussion of this issue by noting that "[i]t is agreed by all authorities in modern times that common carriers are subject to reasonable regulation by the state, and that such regulation should be exercised so as to promote public necessity and convenience; the rights of the public being paramount to those of the carrier." *Id.* The court noted, however, that how such regulation should occur was subject to two different theories: that of "restricted competition" and that of "regulated monopoly." The court held that the legisla-

tive scheme in Arizona was that of a regulated monopoly.

However, it is clear from *Peoples Freight Line* that the power to regulate common carriers was derived from their status as corporations performing a public service, not from the fact that they were regulated monopolies which was a status conferred upon them by the legislature.

This is consistent with the many cases cited by the Company which hold that it is the public character of the service rendered by the Corporation which allows the Commission to exercise jurisdiction over it; monopoly not playing a part in that determination. *See, e.g., General Alarm, Inc. v. Underdown*, 76 Ariz. 235, 262 P.2d 671 (1953); *Arizona Corporation Commission v. Continental Security Guards*, 103 Ariz. 410, 443 P.2d 406 (1968).

We, of course, are not here concerned with whether the Company as a telephone company is a "public service" corporation, Art. 15, § 2 of the Arizona Constitution has mandated that status.

We are therefore drawn to the conclusion that the Commission derives its jurisdiction to set rates for the Company from the Arizona Constitution and not from whether the Company is allowed to exercise a monopoly in any given area.

Determining that the Commission's power to regulate public service corporations is not derived from its power to grant it a monopoly does not end our inquiry, however. It is clear both under prior Arizona decisions and the decisions of other states that a public utility may provide services which are not imbued with a public interest and thus may not be subject to Commission regulations. Thus, *In Re Central Arizona Light & Power Co.*, 6 PUR (NS) 49 (Ariz. Corporation Commission 1934), the Commission itself recognized that the power to regulate a gas company did not extend to regulation of sales by the utility of gas appliances. This concept was well stated in

*City of Phoenix v. Kasun*, 54 Ariz. 470, 97 P.2d 210 (1939):

> But the fact that a business or enterprise is, generally speaking, a public utility does not make every service performed or rendered by those owning or operating it a public service, with its consequent duties and burdens, but they may act in a private capacity as distinguished from their public capacity, and in so doing are subject to the same rules as any other private person so acting.

54 Ariz. at 476, 97 P.2d at 213.

The dichotomy between the jurisdiction to regulate "public" services of the utility and the limited jurisdiction to regulate "private" services of that same utility is aptly drawn in the "Yellow Pages" telephone cases. *Classified Directory Subscribers Association v. Public Service Commission*, 383 F.2d 510 (D.C.Ct. of App., 1967) is illustrative. In that case, the Public Service Commission had concluded that in a telephone directory, the basic light faced classified listings to which all telephone subscribers are entitled as part of the services rendered by the telephone company were subject to the regulatory powers of the Commission. The Commission further concluded that insofar as yellow page advertising is concerned that its power to regulate was limited to prohibition of discriminatory practices and assuring that rates charged for such advertising did not adversely affect the regulated service and rates. However, other than this limited jurisdiction, the Commission concluded that it had no regulatory powers over the actual rates charged for such Yellow Page advertising as that service was not essential to actual telephone usage nor did it constitute an integral part of the public utility service.[3]

The court in affirming these conclusions noted:

> [T]he distinction which the Commission drew between the classified listing, as an integral part of telephone service, and the directory advertising, as primarily a mat-

---

3. The results reached here parallel the Arizona Corporation Commission's 1976 decision, previously described.

ter of private contract, was ... reasonable ....

383 F.2d at 513.

For cases reaching similar results, *see Solomon v. Public Service Commission*, 286 App.Div. 636, 146 N.Y.S.2d 439 (1955); *Felix v. Pennsylvania Public Utility Commission*, 187 Pa.Super. 578, 146 A.2d 347 (1958).

■ We therefore conclude that the power granted to the Commission under Art. 15, § 3 of the Arizona Constitution to prescribe a "just and reasonable rate" for a "service rendered" turns upon a determination of whether the "service rendered" in supplying terminal equipment is an essential and integral part of the public service performed by the Company or is now primarily a matter of private contract between the Company and its customers.

Sears argues that because of the actual lack of effective competition in the terminal equipment field, the Company still enjoys a virtual monopoly in this area and therefore company-supplied terminal equipment is still "essential" to the use of its service. Likewise, the Commission argues that the Company has embarked upon a marketing plan called "Migration Strategy" by which the Company plans to incrementally increase the price of its old terminal equipment so as to coerce its customers into changing to the Company's newer "Flagship" terminal equipment, and thus continue its dominance in the terminal equipment market for the foreseeable future.

■ However valid these arguments may be, this court, like the Commission, is faced with the FCC's legal conclusion in *Second Computer Inquiry* that "CPE [terminal equipment] is a severable commodity from the provision of transmission service." Neither Sears nor the Commission dispute this binding determinative conclusion. It necessarily follows from this conclusion that Section 99 tariff equipment is no longer an integral or essential part of the public transmission service performed by the Company. Therefore, the Commission's jurisdiction to regulate this non-essential service is limited to assuring that the rates charged

for terminal equipment do not result in evasion or frustration of the basic service rates which the Commission has power to regulate and that terminal equipment be offered on a non-discriminatory basis so as not to disrupt overall telephone operations. We therefore hold that subject to this limited jurisdiction, the Commission no longer may exercise regulatory power over the actual rates charged for terminal equipment.

■ Having determined that terminal equipment is legally no longer an integral or essential part of the public service performed by the Company, may the Commission nevertheless exercise rate regulation over this commodity until March 1, 1982? We believe not. We are not here concerned with either the wisdom of *Carterfone* and its progeny culminating in *Second Computer Inquiry*, or with the desirability of effectuating or maintaining favorable consumer marketing conditions. Rather, we are concerned solely with the constitutionally granted power of the Commission to regulate the rates charged for a non-essential service of the Company. In this area, the Commission has only limited constitutional power. The unappealed portions of the 1980 decision and the limited jurisdiction granted by this opinion define that power.

The judgment of the trial court is affirmed.

WREN, C. J., and YALE McFATE, Judge, concur.

*Note* : The Honorable YALE McFATE, a retired judge of a court of record, was authorized to participate by the Chief Justice of the Arizona Supreme Court pursuant to Ariz.Const. art. VI, § 20.