346 P.2d 1091

ARIZONA CORPORATION COMMISSION, and William T. Brooks, George F. Senner, Jr., and E. T. "Eddie" Williams, Jr., as members of and comprising the same, Appellants,

v.

RELIABLE TRANSPORTATION COMPANY, a corporation, duly qualified and doing business in Arizona, and Arizona Tank Lines, Inc., an Arizona corporation, Appellees.

No. 6742.

Supreme Court of Arizona.

Nov. 25, 1959.

Rehearing Denied Jan. 5, 1960.

Wade Church, Atty. Gen., Fred Kallof, Minne & Sorenson, Richard Minne and

Anderson D. Ward, Lewis, Roca, Scoville, Beauchamp & Linton, John P. Frank, Phoenix, for appellants.

Langmade & Sullivan, Evans, Kitchel & Jenckes, Earl H. Carroll, Phoenix, for appellees.

BERNSTEIN, Justice.

This is an appeal by the Arizona Corporation Commission (hereinafter called the "Commission"), from a judgment of the superior court vacating certain orders of the Commission which granted contract motor carrier permits to Cantlay & Tanzola, Inc. (hereinafter called "Cantlay"), and Pacific Intermountain Express Company (hereinafter called "P.I.E.") (Cantlay and P.I.E. are hereinafter sometimes referred to collectively as "appellants").[1]

Pursuant to A.R.S. § 40-608, appellants applied to the Commission for permits to operate as contract motor carriers for the transportation of petroleum and petroleum products, in bulk, in tank transport equipment over irregular routes between all points and places in Arizona for certain designated oil companies. At the hearings on these applications, Reliable Transportation Company and Arizona Tank Lines, Inc. (hereinafter referred to collectively as "ap-

pellees"), certificated by the Commission to transport petroleum products as intra-state common motor carriers, appeared actively in opposition. Thereafter, the Commission entered orders granting permits to Cantlay covering contracts made by it with Union Oil Company of California, General Petroleum Corporation, Shell Oil Company and the Texas Company. P.I.E. was permitted to act as contract motor carrier under contracts with Tidewater Associated Oil Company, Shell Oil Company and Richfield Oil Company.

Appellees, in accordance with A.R.S. § 40-254, commenced the instant actions to vacate and set aside the orders of the Commission. Trial was held before the superior court, without a jury, and following the filing of findings of fact and conclusions of law, judgment was entered vacating and setting aside the orders of the Commission on the ground that they were unlawful.

The Court held, in effect, that appellants were engaged in transporting petroleum products as common carriers and were, accordingly, not entitled to permits as contract motor carriers.

*The Facts.*[2]

Prior to 1956, appellants, pursuant to a grant of authority from the Interstate Com-

---

1. The designation of Cantlay and P.I.E. as "appellants" suggests their true adversary interest, although the Commission is properly the sole party defendant-appellant in this action.

2. In the court below the actions to set aside the Commission's orders granting the several permits to each of the appellants were consolidated. For that reason, perhaps, the operations of both ap-

merce Commission to operate as interstate common carriers, transported substantial volumes of petroleum products, in bulk, into this State from California. Completion in early 1956 of the interstate pipeline between El Paso, Texas and Los Angeles, California, with outlets at both Tucson and Phoenix, substantially reduced the need for interstate motor carriage of petroleum. Shipment of the petroleum into Phoenix and Tucson, and storage there in tank farm facilities did, however, require ultimate distribution by motor carriers on an intra-state basis.

In response to the changed circumstances appellants entered into subject contracts and obtained from the Commission the permits here in issue to operate as intra-state contract motor carriers. Each of the contracts, in essence, requires the carrier to transport a specified minimum gallonage of petroleum products as required by the particular oil company between enumerated points and at stipulated rates. The rates were on various occasions amended for the express purpose of keeping the service "competitive." Each contract imposes the risk of loss during transport upon the carrier, provides for loading, unloading, diversions and returns, and lists equipment to be used by the carrier. The contracts are for various periods up to 10 years, subject to the right of the oil company, at least, to cancel the contract on thirty days' notice.

Whether the contracts were solicited in the first instance by the carriers or the oil companies is not clear from the record but as they were all doing business formerly on an interstate common carriage basis and were in constant communication with each other, the precise source of origin of the contracts appears to be of little moment. Other than listing their names in the Phoenix classified telephone directory, appellants seem not to have advertised or solicited business within Arizona. The fact is, however, that most of the oil companies doing business in Arizona maintain their sales and traffic offices in California.

Pursuant to the contracts, appellants distributed petroleum from the oil companies to three main classes of consignees: distributors, who, as commission agents for the oil companies, maintain bulk plants and distribute petroleum products to gasoline stations and consumers; commercial accounts, which purchase the products for their own use; and gasoline stations. In each case, the routing was arranged and controlled by the oil company which paid the freight and apparently retained title to the product during transport. Each class of consignee, including the distributor, is an

pellants were, in substantial respects, treated together by the trial court and the parties. In the absence of a clear delineation of the impact of each appel-

lant in the field of intra-state motor carriage of petroleum, we have no choice but to conform to the analysis so adopted.

independent business entity and not merely an integrated division of the oil company.

Despite the contractual provisions which apparently contemplated dedication of particular equipment to each oil company, appellant carriers freely interchanged equipment to meet the needs of the oil companies.

The volume of petroleum actually transported by appellants under the contracts does not, unfortunately, appear clearly from the record either as to number of gallons or the percentage of the total intra-state transport. Although appellants testified that they suffered a considerable reduction in business when they shifted to intra-state carriage, there was no evidence of the precise amount involved or whether the total volume of petroleum transported in Arizona dropped substantially when the pipeline was completed or, indeed, whether public motor carriage was displaced in part by other means of intra-state shipment, including private carriage by the oil companies themselves. It does appear that appellants at the time of trial were serving seven of the eight major oil companies doing business in Arizona [3] and it seems fair to conclude, as did the trial court, that appellants had by the time of trial acquired a substantial portion of the available business.

In comparing appellants' former inter-state business with their present intra-state business, it appears that all of the oil companies now under contract were served by appellants under their interstate authority, but it is not clear whether or to what extent appellants have lost any oil company as a customer. It is apparent that the economic function performed by appellants, their modus operandi, and the equipment used are essentially the same now as before, except that appellants now service Arizona on an intra-state basis and each of their customers is under contract. No significant difference appears between appellants' intra-state service and the service performed by other carriers operating as common motor carriers in Arizona. Although appellants may not have actively solicited the remaining petroleum carriage business available in Arizona, it may reasonably be concluded that they are ready, willing and able to undertake such business generally, even that business presently performed by common motor carriers.

On the basis of the evidence the trial court found, that:

appellants "by solicitation and advertising in localities where the business offices of prospective shippers of petroleum products were located, offered their intra-state transportation services of petroleum products within the State

---

3. Prior to trial, P.I.E. had negotiated a contract to transport petroleum products for Gulf Oil Corporation.

of Arizona on substantially the same basis to all shippers";

the contracts between appellants and the oil companies are "substantially uniform" and "do not provide any specialized service not afforded by interstate or intra-state common carriers engaged in transportation of petroleum products in Arizona";

since March 1956 appellants "have engaged in the business of carrying petroleum products in bulk in intra-state commerce in Arizona for others as a public employment, and have held themselves out as ready to engage in the transportation of petroleum products in bulk for a substantial portion of the public requiring such service, as a business, and not as a casual occupation";

appellants have "undertaken to carry goods in intra-state commerce of the kind to which their business is confined" and "have transported substantial volumes of petroleum products in bulk * * * for hire";

appellants "have provided the same service to oil companies as intra-state carriers of petroleum products as provided prior thereto by such carriers as interstate common carriers";

appellants have each transported petroleum products in bulk "for more than one consignor" and "to more than three consignees";

appellants "have used the same tank truck equipment for operations under their different contract permits and * * * have not dedicated.any equipment to operations under a particular contract" and "have used the same equipment and facilities for common and contract carrier services"; and

appellants have limited their activities to the contracts in issue but have by their "general advertising stood ready to offer such services to other similar shippers on substantially the same basis."

The trial court concluded that the services contemplated and actually provided by appellants are those of a common carrier, that appellants have been operating in Arizona under the Commission's permits as intra-state common carriers of petroleum products in bulk, and that the orders of the Commission granting such permits are "arbitrary, unlawful and void." Judgment was thereafter entered vacating and setting aside each of the orders of the Commission.

*Standing of appellees.*

Appellants having challenged the standing of appellees to institute this action, we consider this point first.

A.R.S. § 40–254 provides that "[a]ny party in interest" may commence an action in the superior court to vacate or set aside an order of the Commission. Appellants, denying that appellees are such parties in

interest, assert that they, appellants, even if denied the right to operate as contract carriers, would be entitled to a certificate as common carriers, and conclude that, accordingly, appellees have nothing personally to gain from a decision one way or another in this action. Appellants seem to imply that if they would not be entitled to operate as common carriers, appellees might have an interest substantial enough to permit this action.

It is sufficient to point out that the issue of whether appellants—if common carriers —would be entitled to certificates of public convenience and necessity under A.R.S. § 40-607, is not before this Court and would have to be raised first before the Commission on application duly made pursuant to the above section. We hold that appellees should not be deprived of standing in this action because they *may* be unable successfully to resist alternative relief claimed by appellants in a subsequent proceeding.

Further, appellants' claimed alternative relief, namely to operate as a common carrier, cannot here be said to be the same as their present authority to act as contract carriers. Title 40 of our statutes makes it clear that there is a substantial difference between common carriers and contract carriers, with respect to the scope of control by the Commission, the duties owed to the public and the relationship among the carriers themselves.

The requirement of A.R.S. § 40-608 that notice of a contract carrier hearing be published and that "interested" persons may attend the hearing and offer testimony, and the fact that appellees did appear in opposition at the instant hearings, apparently without objection, and participated actively therein, confirm our holding that appellees are parties "in interest" and proper parties plaintiff to this action.

*Supreme Court review.*

The scope of judicial review of orders of the Commission is clearly set forth in our statutes and in the decisions of this Court.

Under A.R.S. § 40-254, review of an order of the Commission must be sought by commencement of a separate action, triable as other civil actions. In such action appellant has the burden "to show by clear and satisfactory evidence that it [the determination or order of the Commission] is unreasonable or unlawful." This court has held that the trial of such action is *de novo,* in which new evidence may be received and considered.

The nature of this review is well stated in Corporation Commission of Arizona v. People's Freight Line, Inc., 1932, 41 Ariz. 158, 16 P.2d 420:

"It will be seen, upon examining the language of this section [Arizona Revised Code 1928, § 720 which is the predecessor of A.R.S. § 40-254], that

the proceeding is not an appeal from the decision of the commission, but it is a new and independent action. The case is heard *de novo* upon such evidence as may be proper, and not merely upon a review of the evidence taken before the commission. Such being the case, the trial court is not bound by the rule followed on an appeal by this and by most appellate courts to the effect that, if any reasonable evidence sustains the order of a lower tribunal, an appellate court will not consider and review the weight of the evidence, or the inferences drawn therefrom by the trial court. The superior court in this proceeding had the right to form its own judgment as an independent tribunal as to the conclusion to be drawn from the evidence, subject only to the rule laid down \* \* \*, that the burden of proof is on the plaintiff to show by clear and satisfactory evidence that the order of the commission is unreasonable or unlawful." 41 Ariz. at pages 160–161, 16 P.2d at page 421.

See also, Trico Electric Cooperative, Inc. v. Corporation Commission, 1959, 86 Ariz. 27, 339 P.2d 1046, 1052; Gibbons v. Arizona Corporation Commission, 1953, 75 Ariz. 214, 217, 254 P.2d 1024; Metropolitan Lines, Inc. v. Brooks, 1950, 70 Ariz. 344, 346, 220 P.2d 480; Corporation Commission v. Southern Pacific Co., 1940, 55 Ariz. 173, 177, 99 P.2d 702.[4]

The fact that new evidence may be introduced at the trial qualifies to some extent the apparently strict rule that the order of the commission may be set aside only if it is "unreasonable or unlawful." Thus, the superior court may properly hold an order unreasonable on the basis of the "clear and satisfactory evidence" presented to it, whereas it may be perfectly apparent that the Commission acted reasonably on the basis of the evidence which it had to consider.

■ Although Section 17 of Article XV of the Arizona Constitution, A.R.S., contemplates an "appeal" from an order of the Commission, it is clear that this provision, intended as a protection to public service corporations, is more than adequately satisfied by the above-noted statutory scheme of *de novo* review.

■ Recognition of the scope of review of the order of the Commission by the first reviewing court, i. e., the superior court, does not imply that this Court is entitled to review the superior court in like manner. Thus, in Corporation Commission of Arizona v. People's Freight Line, Inc., supra, the Court, following its discussion, quoted

4. We note in passing that review of a Commission rate order, promulgated pursuant to a specific constitutional grant of authority, is, contrary to the instant situation, strictly limited. Simms v. Round Valley Light & Power Co., 1956, 80 Ariz. 145, 154, 294 P.2d 378.

above, of the superior court review of an order of the Commission, stated:

"We consider next whether the order of the superior court setting aside the order of the commission was supported by substantial evidence. Since the proceeding before us is an appeal, and not a trial *de novo*, we must assume the decision of the superior court to be correct if there is any reasonable evidence in the record to sustain it." 41 Ariz. at page 162, 16 P.2d at page 421.

The rule of limited Supreme Court review is in accord with numerous decisions of this Court. Thus, in Southern Pacific Co. v. Corporation Commission, 1958, 84 Ariz. 365, 368, 329 P.2d 883, 884, appeal dismissed, 1959, 359 U.S. 532, 79 S.Ct. 1136, 3 L.Ed.2d 1028, this Court, in reviewing a judgment of the superior court which affirmed an order of the Commission, stated that

"* * * we must affirm the trial court's judgment if the evidence conflicts or if substantial evidence supports its judgment."

See also, Church v. Meredith, 1958, 83 Ariz. 377, 378, 321 P.2d 1035; Torosian v. Paulos, 1957, 82 Ariz. 304, 310, 313 P.2d 382; Anderson v. Artesia Inv. Co., 1948, 66 Ariz. 335, 338, 188 P.2d 455; Rule 52(a) of the Rules of Civil Procedure, 16 A.R.S.

The test, therefore, is whether there is substantial evidence in the record before

this Court to support the finding of the superior court that the order of the Commission herein declaring appellants contract motor carriers was shown by clear and satisfactory evidence to be unlawful.

■ It is noted that the Commission neither made a specific finding that appellants were "contract motor carriers" (although such finding is implicit from its order) nor recited facts found by it to support such finding. The superior court did, however, make findings of fact which we hold amply support its conclusion that appellants are operating as common motor carriers. Based upon an examination of the entire record we hold further that such findings are amply supported by substantial evidence.

■ Because the question of whether a motor carrier operates on a contract or common carrier basis is not one strictly of fact but rather involves serious questions of public policy as expressed in our Constitution and statutes, we deem it appropriate to review the law and evidence in greater detail than would otherwise be necessary to sustain the judgment below.

*Status of Carriers.*

Section 10 of Article XV of the Arizona State Constitution provides that

"* * * all railroad, car, express * * * corporations, for the transportation of * * * oil, or other property for profit, are declared to be

common carriers and subject to control by law."

In Corporation Commission of Arizona v. Pacific Greyhound Lines, 1939, 54 Ariz. 159, 94 P.2d 443, this Court construed the above section as follows:

"It may be said that motor vehicles are not mentioned in section 10, supra, and, therefore, they are not covered thereby. While it is true that motor vehicles are not expressly mentioned in this section, we think it is evident that this is because at the time of the adoption of the constitution in 1910 there were no motor vehicles in existence in Arizona, and perhaps not in the United States, engaged in the business of common carriers. In view of the very inclusive language used in the section, we think it obvious that it was intended to cover all known methods for the transportation of persons, electricity, messages, water, oil, or any property for profit, and that it should be construed as including motor vehicles operating as common carriers for profit on the public highways. All of these corporations are declared to be 'subject to control by law' which, as we have said, clearly implies a legislative act." 54 Ariz. at pages 174–175, 94 P.2d at page 449.

Although the above-quoted statement includes "motor vehicles *operating as common carriers* for profit on the public highways" within the scope of Section 10, it is significant that the constitutional provision does not distinguish between contract and common carriers but rather declares all of the corporations so enumerated to be "common carriers" subject to control by law.

In implementing this grant of constitutional authority, the legislature, in A.R.S. § 40–601, subd. A, defined the two classes of carriers, as follows:

"3. 'Common motor carrier of property' means any person engaged in the transportation on any public highway by motor vehicle of property for compensation as a common carrier.

\*      \*      \*      \*      \*      \*

"5. 'Contract motor carrier of property' means any person engaged in the transportation by motor vehicle of property, for compensation, on any public highway, and not included in the term common motor carrier of property, \*  \*  \*".

Though the classification of carriers obviously depends on the definition of the term "common carrier," which is not defined in the statute, the legislature has cast upon each carrier the burden to exclude itself from the class of common carriers. Thus, A.R.S. § 40–601, subd. B provides:

"The transportation for more than one consignor, or to more than three consignees, by any motor carrier, shall

be prima facie evidence that such motor carrier is acting as a common carrier."

Without having to decide the precise effect of such a provision, in terms for example of the power of the court to direct a jury verdict, we note that this Court has held that a legislative declaration that establishment of one fact is prima facie evidence of another fact is entitled to greater weight than the ordinary presumption arising out of common law rules of evidence. Compare Mitchell v. Emblade, 1956, 81 Ariz. 121, 123, 301 P.2d 1032; Southern Pacific Co. v. Nelson, 1919, 20 Ariz. 344, 180 P. 987; with Flores v. Tucson Gas, Electric Light & Power Co., 1939, 54 Ariz. 460, 465–466, 97 P.2d 206; Silva v. Traver, 1945, 63 Ariz. 364, 162 P.2d 615; cf., State Tax Commission v. Phelps Dodge Corp., 1945, 62 Ariz. 320, 330, 157 P.2d 693.

The distinction between the two classes of motor carriers becomes meaningful in relation to the extent of regulation and control by the Commission. Thus, under A.R.S. § 40–605, applicable only to common motor carriers, the Commission is authorized to fix and determine "just, reasonable and sufficient rates, fares, charges and classifications"; to "regulate the facilities, service and safety of operations"; to regulate "operating and time schedules to meet the needs of the public and to insure adequate transportation service through the territory traversed or served by the carriers and thereby prevent unnecessary duplication of service"; to prescribe a uniform system of accounts; to require annual reports, schedules, tariffs, and other data; and to "[s]upervise and regulate such carriers in all matters affecting relations between the carriers and the public and between the carriers and other common motor carriers, * * *."

A.R.S. § 40–606 requires each common motor carrier to furnish full information, including its financial condition, equipment, physical property, routing, rates and schedules. A.R.S. § 40–612 requires a common motor carrier to obtain permission from the Commission before abandoning or discontinuing any service which it was authorized to operate.

Significantly, none of the above sections applies to contract motor carriers, with the exception that such a carrier must notify the Commission after it has ceased or abandoned any of its operations. (A.R.S. § 40–612)

The distinction between a common and contract motor carrier applies also to the certification required before either may operate within the State. Under A.R.S. § 40–607 a common motor carrier is required to satisfy the Commission that "the public convenience and necessity requires the proposed service * * *." A.R.S. § 40–608 requires the Commission to find that the granting of a permit to a contract motor carrier—

"* * * will not endanger the safety of the public or interfere with the public use of the public highways, or impair the condition or maintenance of the highways, directly or indirectly * * *."

The application for either certificate is essentially the same except that a common motor carrier must set forth its proposed schedules and tariffs. In each case the Commission has discretion to impose conditions or limitations in the certificate and must find that the applicant is a "fit and proper person." A.R.S. §§ 40-607, 40-608.

■ The very material differences in the extent of regulation of common and contract motor carriers suggest the legislative rationale to be given effect in defining the two classes of carriers. Under the doctrine of "regulated monopoly," which is "the basic law of the state" (see Old Pueblo Transit Co. v. Arizona Corp. Commission, 1958, 84 Ariz. 389, 390, 329 P.2d 1108, 1109), it is obvious that certain motor carriers are deemed to be so affected with the public interest and welfare that they should be regulated in the interest of the public; other carriers which are not so affected need not be subject to such stringent regulation.

The definition of a common carrier, based upon common law standards, was, perhaps, first set forth in this State in Santa Fe, Prescott & Phoenix Railway Co. v. Grant Brothers Construction Co., 1910, 13 Ariz.

186, 192, 108 P. 467, reversed on other grounds, 1913, 228 U.S. 177, 33 S.Ct. 474, 57 L.Ed. 787, and was subsequently approved in the leading case of Claypool v. Lightning Delivery Co., 1931, 38 Ariz. 262, 299 P. 126, as follows:

" ' " (1) He must be engaged in the business of carrying goods for others as a public employment, and must hold himself out as ready to engage in the transportation of goods for persons generally as a business, and not as a casual occupation. (2) He must undertake to carry goods of the kind to which his business is confined. (3) He must undertake to carry by the methods by which his business is conducted, and over his established roads. (4) The transportation must be for hire. (5) An action must lie against him if he refuses, without sufficient reason, to carry such goods for those who are willing to comply with his terms." '

"The first four characteristics set forth in this definition are almost universally approved, and we reiterate them as being correct. We think, however, that, strictly speaking, the fifth has no place in the definition of a common carrier. It is rather a liability which the law imposes on a party only if, as, and when it is already determined to be a common carrier. Lloyd v. Haugh & Keenan Storage & T. Co., 223 Pa. 148, 72 A. 516, 21 L.R.A.,N.S.,

188. It is not necessary, however, in order to constitute a party a common carrier, that it operate its means of conveyance between fixed termini, nor upon regular schedules, nor at a uniform or fixed tariff. Cushing v. White, 101 Wash. 172, 172 P. 229, L.R.A. 1918F, 463; State v. Boyd Transfer & Storage Co., 168 Minn. 190, 209 N.W. 872; Collier v. Langan & Taylor Storage & Moving Co., 147 Mo.App. 700, 127 S.W. 435; Jackson Architectural Iron Works v. Hurlbut, 158 N.Y. 34, 52 N.E. 665, 70 Am.St.Rep. 432. And it in no way alters the character of a common carrier that it makes specific and individual contracts, either written or oral, for each business transaction. Smitherman & McDonald v. Mansfield Hardwood Lbr. Co., D.C., 6 F.2d 29; Breuer v. Public Utilities Comm., 118 Ohio St. 95, 160 N.E. 623; State v. Washington Tug & Barge Co., 140 Wash. 613, 250 P. 49. Nor can a carrier which holds itself out to the public as being a common carrier divest itself of that character because it has a secret or private intention to reserve the right to refuse to serve such parties as it objects to, or because it may, even upon occasion, exercise such right, particularly if such reservation and exercise thereof is in reality, though not ostensibly, merely for the purpose of divesting itself of the character and re-

sponsibility of a common carrier. Cushing v. White, supra; Stoner v. Underseth, 85 Mont. 11, 277 P. 437; Goldsworthy v. Public Service Comm., 141 Md. 674, 119 A. 693; State v. Washington Tug & Barge Co., supra; Lloyd v. Haugh & Keenan Storage & T. Co., supra; Davis v. People, 79 Colo. 642, 247 P. 801; Sanger v. Lukens, D.C., 24 F.2d 226.

"As was said by the Supreme Court of the United States in Terminal Taxicab Co. v. Kutz, 241 U.S. 252, 36 S.Ct. 583, 584, 60 L.Ed. 984, Ann.Cas.1916D, 765, in determining whether the plaintiff in that case was a common carrier: 'The important thing is what it does, not what its charter says.' So in this, as in any other similar case, it is the general conduct of the actual business, and not isolated acts or statements, public or private, which fix the character of a common carrier on a party. And no form of subterfuge or evasion will prevent the courts from going behind the form to the substance." 38 Ariz. at pages 266–267, 299 P. at page 127.

■ Disregarding the 5th characteristic for the reason stated above, it may be noted that 2, 3 and 4 apply generally to contract and common motor carriers. The essential distinction, therefore, is in terms of the "holding out" of the particular motor

carrier. This test is properly relevant and indeed determinative because a motor carrier which holds itself out to the public generally has embarked upon activities which under our system of "regulated monopoly" require regulation and control in behalf of the public.

The concept of "holding out" cannot be limited, however, merely to traditional soliciting or advertising, for the reason that the legislative controls are designed to cover not the methods utilized by the carrier to acquire business but rather its participation in the field in which it operates. The choice in the first instance belongs to the particular motor carrier. No carrier is forced to become a common carrier, but when it holds itself out to serve the public generally or when it in fact does so, it subjects itself to regulation. The concept of "the public" in this area includes those persons or companies which require or may require the particular type of service furnished by the motor carrier.

■ The method adopted by a motor carrier to serve its public generally may be through separate negotiated contracts. Although contract carriage presupposes separate contracts, the converse does not follow as a matter of logic or law. A motor carrier may by means of contracts play such a substantial role in the particular field of carriage as to function, in essence, as a common carrier.

■ In sum, a particular motor carrier may participate so extensively in the area of public transportation, even without active solicitation or advertising, that it may properly be declared to have held itself out to serve the public generally. To permit such a carrier to escape regulation as a common carrier would negate to a large extent the legislative policy embodied in A.R.S. Title 40.

*Appellants are common motor carriers.*

■ There is no dispute that each of the appellants transports petroleum for more than one consignor and to more than three consignees, and that, as a result, appellants have the burden to exclude themselves from the class of common carriers (A.R.S. § 40–601, subd. B). This burden appellants have failed to sustain nor have they overcome the constitutional and legislative thrusts in favor of defining carriers generally as common carriers. The findings of the trial court support this conclusion and are amply substantiated by the evidence.

The operations performed by appellants in the field of transportation of petroleum in bulk are substantial, and not merely casual or of a special character. Appellants' activities, which have a considerable impact in this area of transportation, are not materially different from the services previously performed by them as interstate common carriers or, indeed, from those per-

formed by other intra-state carriers operating in Arizona.

The contracts negotiated between the appellants and the oil companies, which contracts may be bona fide and binding, do not in any significant manner modify the characteristics formerly attributable to appellants when they were serving the same oil companies as interstate common carriers. The interchange of equipment, which could be utilized equally for common carriage even on an interstate basis, and the change of rates to meet competition, demonstrate that the operations of appellants were not in a separate category from the general field of petroleum carriage. Nor does retention by the oil companies of title to the petroleum and of control of the routing, during shipment, especially where this practice had been followed when appellants operated as common carriers, affect that conclusion.

The ability and, indeed, willingness of appellants to serve, within the limits of their facilities, the other oil companies doing business in Arizona appear from the record. In the field of petroleum carriage where the number of oil companies is relatively small and where a substantial number of them maintain sales or traffic offices in another state, solicitation or advertising through ordinary channels, which may be appropriate in other areas of public transportation, becomes a less important factor. Here, appellants, who are apparently in constant contact with the out-of-state offices of the oil companies, need not solicit or advertise in Arizona to acquire business, especially where they are serving, in a substantially similar manner, a significant number of oil companies which are virtually indistinguishable from the other oil companies which constitute the available public in need of petroleum carriage.

We hold that appellants were properly found by the trial court to be common motor carriers within the meaning and purposes of Title 40 of our statutes.

The judgment is affirmed.

PHELPS, C. J., and JOHNSON, J., concur.

STRUCKMEYER and UDALL, JJ., dissent.