443 P.2d 406

The ARIZONA CORPORATION COMMISSION and Armored Motor Service of Arizona, Inc., and Securities Transport Company, Inc., Appellants,

v.

CONTINENTAL SECURITY GUARDS, an Arizona corporation, Appellee.

No. 9020–PR.

Supreme Court of Arizona,
In Banc.

July 12, 1968.

Rehearing Denied Oct. 8, 1968.

**411**

Gary K. Nelson, Atty. Gen., Darrell F. Smith, Former Atty. Gen., by H. J. Lewkowitz, Phoenix, Evans, Kitchel & Jenckes, by Earl H. Carroll and G. Starr Rounds, Phoenix, for appellants.

Kaplan, Wilks & Abrams, by Richard B. Wilks, Gorey & Ely, by Herbert L. Ely, Phoenix, for appellee.

McFARLAND, Chief Justice:

This case is before us upon a petition for review of a decision of the Court of Appeals. 5 Ariz.App. 318, 426 P.2d 418.

A complaint was filed with the Arizona Corporation Commission, hereinafter called the Commission, by Armored Motor Service of Arizona and Securities Transport Company, hereinafter called intervenors. They alleged that Continental Security Guards, a corporation hereinafter called Continental, was operating an armored-car service without either a permit or a certificate of convenience and necessity, and was soliciting business in competition with the intervenors who previously enjoyed a monopoly in Arizona by virtue of their certificates of convenience and necessity. After a hearing, the Commission issued a cease-and-desist order against Continental, and Continental brought this action in superior court, pursuant to A.R.S. § 40–254, to set aside the Commission's order.

The superior court found that Continental was engaged in the business of protecting, in transit, money and valuables transported by it in armored cars, but that "the function of transportation is incidental to the prime function which is the physical protection of the property transported," held that the Arizona Corporation Commission acted in excess of its jurisdiction, and set aside the Commission's order. From this judgment, the Commission and the intervenors appealed. The court of appeals reversed the superior court, and reinstated the findings of the Commission.

The answer to the question of whether the Arizona Corporation Commission has jurisdiction over the business of transporting money and valuables in armored cars, for hire, has its roots in the nation's history —particularly that of the last half of the 19th century—the era of railroad-building and of the "Robber Barons."

"The construction of the railroads in the United States was typically American: As soon as it was generally recognized how excellent a highway the railroad afforded, the problem was how to get the most possible railroads built in the shortest possible time. Great inducements were held out to encourage railroad building. The laws with reference to their construction and operation were made very broad. The promoter of railways was looked upon as a public benefactor and under an imperative popular demand, general laws were enacted in many states enabling projectors of roads to organize at pleasure and to select their own lines. After construction was completed the directors were also permitted to operate practically as they saw fit, and with

**412**

almost the same freedom as in an ordinary private business. The builders of a new road assumed great risks, and when their venture proved successful, having conferred a very great benefit upon the public, they were properly entitled to charge, if they saw fit to do so, such rates as would net them a handsome return.

\*  \*  \*  \*  \*  \*

"Capitalists would not have put their money into the building of railroads if their operation had been governed by the detailed regulations now in force. In 1840 the question was how to get railroads, not how to control them." Drinker: A Treatise on the Interstate Commerce Act, p. 54

At first every new road was a boon to everyone, and, in comparison with the old wagon rates, almost any rate was reasonable. About 1880, even though in many places the existing roads were sufficient to serve the public, new lines were built for speculative purposes, resulting in wholesale cutting of rates and many railroad bankruptcies.

Unrestrained competition among the railroads developed, which in turn gave rise to kickbacks, rebates, favoritism and discrimination. A railroad would make a concession in rates to a large shipper to get his business. The concession could mean the difference between success and failure for that business, and frequently led to the destruction of its competitor. This made the survivor even stronger and larger and gave him the means to demand even larger concessions. In this way many of the great trusts of those days obtained their power and great size.

Another abuse that arose started when the railroads began to acquire interests in enterprises along their rights-of-way. This led naturally to concessions and preferences for those businesses in which the railroads were interested at the expense of their competitors.

In like manner, it was to the railroads' interests to concentrate traffic at large cities where it could be handled more cheaply in large quantities than in small cities for handling in small quantities. As a result, the railroads gave lower rates to certain cities than to others which were closer, resulting in favoring the growth of some cities over others.

Bankruptcies among the railroads, favoritism to powerful shippers, and rate preferences to some cities over others, eventually brought the people to a realization that the railroads must somehow be controlled, so as to make them serve the public to the best advantage. The result was the Interstate Commerce Act, followed by the great body of case law decided under it, and its subsequent amendments.

"At the bottom of this legislation, there is a \* \* \* socialistic principle. In a new community natural resources are best developed by allowing great individual liberty. When, however, this development has been allowed to go on for a certain time, the fittest soon begin to prove their right to survive, and to assert their superiority in a more and more marked degree, reaping the results of their ability in ever-increasing additions of wealth and power. This excites the jealousy of the poorer classes, who begin to realize that when extreme liberty has reached the point of having subjected the many to the few, it is of doubtful advantage to the community. \* \* \* This is the whole problem of modern legislation—how far the times warrant the legislators in letting the people alone \* \* \* old laws must be modified for the protection of the many. This modification should properly be a gradual one, but in this country nothing is done gradually. The carriers were permitted to rest secure in their arbitrary attitude until the abuses became so extravagant as to beget laws in some instances perhaps more radical than necessary." Drinker, Op. Cit., pp. 58 and 59

In Interstate Commerce Commission v. Chicago Great Western Railway Company, C.C., 141 F. 1003, 1014, the court stated:

"The principal objects of the interstate commerce act, * * * were to secure just and reasonable charges for transportation; to prohibit unjust discriminations in the rendition of like service under similar circumstances and conditions; to prevent undue or unreasonable preference to persons, corporations, or localities; to inhibit greater compensation for a shorter than for a longer distance over the same line; and to abolish combinations for the pooling of freight. *It was not designed to prevent competition between different roads, but rather to encourage competition. * * *"*

It is thus easy to understand why Arizona's constitution has, from the beginning, provided for the regulation of certain businesses. The Arizona Constitution, Article 15, A.R.S., reads:

"Section 10. Railways heretofore constructed, or that may hereafter be constructed, in this State, are hereby declared public highways, and all railroad, car, express, electric, transmission, telegraph, telephone, or pipeline corporations, for the transportation of persons, or of electricity, messages, water, oil, or other property for profit, are declared to be common carriers and subject to control by law."

The legislature has implemented this provision by the following sections appearing in Arizona Revised Statutes, as amended Laws 1960:

"§ 40–601. Definitions

"A. In articles 1 and 2 of this chapter, unless the context otherwise requires:

\* \* \* \* \* \*

"3. 'Common motor carrier of property' means any person engaged in the transportation on any public highway by motor vehicle of property for compensation as a common carrier.

\* \* \* \* \* \*

"5. 'Contract motor carrier of property' means any person engaged in the transportation by motor vehicle of property, for compensation, on any public highway, and not included in the term common motor carrier of property, * * *.

\* \* \* \* \* \*

"8. 'Private motor carrier' means any person not included in the term 'common motor carrier' or 'contract motor carrier' * * *.

\* \* \* \* \* .*

"B. The transportation for more than one consignor, or to more than three consignees, by any motor carrier, shall be prima facie evidence that such motor carrier is acting as a common carrier.

\* \* \* \* \* \*

"§ 40–602. Carriers regulated

"No motor carrier or private motor carrier shall operate any motor vehicle on any public highway except in accordance with the provisions * * * of this chapter.

\* \* \* \* \* \*

"§ 40–607 Certificate of convenience and necessity required to operate common motor carrier; application; notice; hearing; issuance of certificate

"A. A common motor carrier shall not operate within this state as such without first having obtained from the commission a certificate of public convenience and necessity. * * *

\* \* \* \* \* \*

"§ 40–608 Certificate of convenience and necessity required to operate contract motor carrier; application; notice; hearing; issuance of certificate

"A. No contract motor carrier shall operate within this state as such without first having obtained from the commission a permit authorizing such operation. * * *

\* \* \* \* \* \*

"C. If, after a hearing on the application, the commission finds·that the privilege sought will not endanger the safety of the public or interfere with the public use of the public highways, or impair

the condition or maintenance of the highways, directly or indirectly, and the applicant is a fit and proper person to receive such permit, the permit may be granted upon limitations, terms and conditions the commission prescribes."

This Court, in Corporation Commission v. People's Freight Line, Inc., 41 Ariz. 158, 16 P.2d 420, in interpreting the above provisions, has said:

"It is agreed by all authorities in modern times that common carriers are subject to reasonable regulation by the state, and that such regulation should be exercised so as to promote public necessity and convenience; the rights of the public being paramount to those of the carrier. There are, however, two widely different theories * * * as to how the public convenience can best be served. The one holds that it is by restricted competition, and the other that it is by regulated monopoly.

"In the past the generally prevailing impression among both legislators and courts was that free competition was a legitimate and proper, and, indeed, the best means of protecting the interest of the public and promoting the general welfare in respect to service by common carriers and public utility corporations. That this system worked fairly well when carriers were few and transportation needs small may be admitted, but as business became more complex and the services rendered by common carriers more and more vitally necessary to modern civilization, history and experience both clearly demonstrated that public convenience and necessity are not furthered in most cases by the maintenance and operation of a number of competing plants or systems of the same character to supply a locality, but that they are generally far better served in the long run by the maintenance only of the smallest number of such instrumentalities which will adequately serve the public needs. Many years of bitter experience have proved beyond a doubt in every line of public service, including that of carriers, that if more than one instrumen-

tality is allowed to operate when one is amply sufficient to meet the public needs, the actual cost to the public in the long run is not only as a rule greater than it would be with but one plant, but the service is also less satisfactory. Past history has shown that in public service enterprises competition in the end injures rather than helps the general good and that whether in public or private hands, such utilities are best conducted under a system of legalized and regulated monopoly.

"The popular mind has been so long impregnated with the idea that competition is the only relief against oppression that it is difficult for the people to understand, without careful consideration, that oppression may be best prevented or removed by fair and just regulation of a monopoly, * * * competition among the great public service corporations is an iridescent dream, for by contract, by combination, or consolidation eventually a monopoly is established, and in the long run such duplication must be and is paid for by the community, * * * while if a public utilities commission has the power to allow a monopoly with regulated rates and conditions of service, * * * it will be in the end better for the public than cutthroat competition.

* * * * * *

" * * * the method * * * by which the end sought by the public utility acts, to wit, the public necessity and convenience, is to be reached, is regulated monopoly rather than the competitive system. * * * "

This Court has frequently restated the fact that the doctrine of "regulated monopoly" is the basic law of the state. We reaffirmed this principle as late as 1960, in Arizona Corporation Commission v. Reliable Transportation Company, 86 Ariz. 363, 346 P.2d 1091. However, in that case we qualified the rule, stating that:

" * * * it is obvious that certain motor carriers are deemed to be so affected with the public interest and welfare that they

should be regulated in the interest of the public; *other carriers which are not so affected need not be subject to such stringent regulation."* [Emphasis ours.] This language was used in connection with the distinction between common carriers and contract carriers.

In our pronouncements throughout the years, we have limited the extension of the power of the corporation commission. In Quick Aviation Company v. Kleinman, 60 Ariz. 430, 138 P.2d 897, we held that the carrying of insecticides by plane from the place of takeoff to the fields to be dusted was incidental to the dusting operation, and that in transporting such insecticides the transporter was not acting as a common carrier and therefore not under the jurisdiction of the corporation commission. In Killingsworth v. Morrow, 83 Ariz. 23, 315 P.2d 873, we held that the towing of disabled autos was incidental to the servicing and repairing done to them, and therefore not under the jurisdiction of the commission. In Visco v. State ex rel. Pickrell, 95 Ariz. 154, 388 P.2d 155, we held that trash was not "property," and that the carrier was not subject to the corporation commission's control. While these cases are not exactly like the instant case, they serve to show the underlying aversion of this Court to any extension of the power and scope of the corporation commission to businesses not patently in need of the Commission's control.

The Commission took the position that Continental's operation was in violation of the law because if it were a common carrier, it was operating without a certificate of convenience and necessity, while if it were a contract carrier, it was operating without a permit.

Continental offers security services of various kinds. Commencing in 1956, it has grown until it now employs more than 150 people and operates five divisions: training and placement; polygraph; investigation; security; and armored-car service, which is part of security. It tries to sell package protection. If it furnishes security guards for a business, it tries to sell its armored-car service too, although it will sell any one service separately. Thinking that it would help its case, it had, prior to the hearing below, discontinued making a separate charge for the armored-car service. At the time of the trial it had only ten customers for its armored-car division, and the armored car itself is leased, not owned. Continental hopes to expand throughout the state, and solicits potential clients throughout the state by mail, telephone, personal contact, and newspaper advertisements. Its armored-car receipts so far account for only about five percent of its gross revenues. It has been soliciting business at prices that appear to be about one-half of what the intervenors have been charging.

Continental makes an individual contract with each customer, and probably operates much the same as intervenors, who admittedly do not take on a client unless they can conveniently work him into one of their regular armored-car routes. Intervenors testified that if a solitary potential customer wanted an armored car in a distant place at a special time, he would be turned down unless "you could make a living out of it. In other words, you couldn't have a truck sitting in front of every door."

This case was argued both in the trial court and in the court of appeals on the theory that the transportation of money and valuables is incidental to Continental's main business, which is protection and security. Though Continental's armored-car revenue accounts for only five percent of its total receipts, a determination of the type of business cannot be based solely on the percentage of receipts. The use of a percentage as the sole criterion of whether a certificate is needed, would enable a large business to conduct a small common-carrier operation, provided that the ratio of the receipts of the latter to those of the whole business is small. The trial judge put his finger on the core of this matter when he found that Continental's activities

"* * * are not activities which classify them as contract or common carriers and therefore they are private carriers

* * * That * * * the plaintiff and intervenors are not clothed with a public interest sufficient under the laws of the State of Arizona to subject them to governmental control as a public service corporation."

The right to regulate common carriers is not, and cannot be questioned. The Constitution and the legislature have delegated this power to the corporation commission. The difficulty arises from the fact that the statutes delegating this power include certain powers with reference to contract and private carriers. It is necessary to ascertain the extent and the legality of those powers.

Black's Law Dictionary defines a common carrier as one who carries, or holds himself out as willing to carry, goods for everyone within the limits of his capacity. If he may carry or not, as he deems best, he is but a private individual and is vested, like all other private persons, with the right to make his own contracts. Fixed termini, regular schedules, and uniform tariffs are not essential to make one a common carrier, and the single fact that he makes individual contracts with each customer will not change his character. Claypool v. Lightning Delivery Co., 38 Ariz. 262, 299 P. 126.

A good discussion of what constitutes a common carrier is found in Ace-High Dresses v. J. C. Trucking Co., 122 Conn. 578, 191 A. 536, 112 A.L.R. 86, which states:

"Ordinarily the controlling factor is the public undertaking, either express or implied from a course of business, to carry for hire the goods of *all* persons who may apply for such carriage. * * * One having such goods to ship may offer them to such carrier, whose duty it is to accept them and carry them, without further contract with the individual shipper. * * The private carrier, on the other hand, carries only for persons with whom he has an initial contract. It is optional with him whether he will accept or reject any business that is offered to him. * * * *The fundamental distinction is that the private carrier enters into a contract with each of his customers and as-sumes no obligation to carry for any other, while the common carrier undertakes to carry for all persons indifferently. * * ***" [Emphasis ours]

In Terminal Taxicab Company v. Kutz, 241 U.S. 252, 36 S.Ct. 583, 60 L.Ed. 984, Mr. Justice Holmes had the following to say about the distinction between public and private carriers in a case involving a taxicab company:

"* * * It asserts the right to refuse the service, and no doubt would do so if the pay was uncertain, but it advertises extensively, and, we must assume, generally accepts any seemingly solvent customer. * * * this * * * business is not to be regarded as a public utility. It is true that all business, and, for the matter of that, every life in all its details, has a public aspect, some bearing upon the welfare of the community in which it is passed. But, however it may have been in earlier days as to the common callings, it is assumed in our time that an invitation to the public to buy does not necessarily entail an obligation to sell. It is assumed that an ordinary shopkeeper may refuse his wares arbitrarily to a customer whom he dislikes, and although that consideration is not conclusive [German Alliance Ins. Co. v. Barnes, 233 U.S. 389, 407, 34 S.Ct. 612, 58 L.Ed. 1011], it is assumed that such a calling is not public as the word is used. In the absence of clear language to the contrary it would be assumed that an ordinary livery stable stood on the same footing as a common shop, and there seems to be no difference between the plaintiff's service from its garage and that of a livery stable. * * *"

In Georgia Public Service Commission v. Taylor, 172 Ga. 100, 157 S.E. 515, the Syllabus Opinion By the Court, in determining the status of a trucking concern, stated:

"* * * The mere fact a carrier invites all and sundry persons to employ him does not render him a common carrier, if he reserves the right of accepting or rejecting their offers of goods for carriage, whether his vehicles are full or

empty, being guided in his decision by the attractiveness or otherwise of the particular offer, and not by his ability or inability to carry, * * *."

Despite the fact that A.R.S. § 40–601, subsec. B, supra, makes transportation for more than one consignor or to more than three consignees, prima facie evidence that a carrier is acting as a common carrier, the trial judge found that Continental was not acting as a common carrier. We think that the finding was justified.

A.R.S. § 40–607, subsec. A, supra, gives to the corporation commission the power to require a certificate of public convenience and necessity from common carriers, and § 40–608 subsec. A, supra, a permit from contract and private carriers. In State v. Smith, 31 Ariz. 297, 252 P. 1011, we said:

"* * * Doubtless the Legislature has power to place such carriers under the control of the corporation commission and confer upon such commission the power to prescribe for them regulations necessary for the public safety and order in respect to their operation upon the highways, and to require them to obtain a license before operating, but not the power to compel them to become public carriers and subject to the same control. * * *"

In Arizona Corporation Commission v. Reliable Transportation Company, supra, we said:

"The distinction between a common and contract motor carrier applies also to the certification required before either may operate within the State. Under A.R.S. § 40–607 a common motor carrier is required to satisfy the Commission that 'the public convenience and necessity requires the proposed service * * *' A.R.S. § 40–608 requires the Commission to find that the granting of a permit to a contract motor carrier—

"'* * * will not endanger the safety of the public or interfere with the public use of the public highways, or impair the condition or maintenance of the highways, directly or indirectly. * * *'

* * * * * *

"The very material differences in the extent of regulation of common and contract motor carriers suggest the legislative rationale to be given effect in defining the two classes of carriers. Under the doctrine of 'regulated monopoly,' which is 'the basic law of the state' (see Old Pueblo Transit Co. v. Arizona Corp. Commission, 1958, 84 Ariz. 389, 390, 329 P.2d 1108, 1109), it is obvious that certain motor carriers are deemed to be so affected with the public interest and welfare that they should be regulated in the interest of the public; other carriers which are not so affected need not be subject to such stringent regulation."

It is therefore clear that the legislature has legally delegated to the corporation commission the power to require a certificate of public convenience and necessity for common carriers and the power to regulate them and their rates in the public interest. It is also clear that the legislature has legally delegated to the Commission the power to require a permit for contract carriers. Such permit implies the fulfillment of certain conditions by the carrier before he can obtain it. The scope of permissible conditions is not as broad as those which can be required of the common carrier. Although the statute provides that the permit may be granted upon such terms and conditions as the Commission may impose, the Commission does not have carte blanche in this regard.

In State v. Smith, supra, we limited the Commission's power, saying:

"* * * If it be held that the Legislature intended to confer on the corporation commission the power to forbid the use of the public highways of the state to private carriers of freight and passengers until and unless such 'private carrier submit to the conditions of becoming a common carrier and of being regulated as such by the railroad commission,' the law would be unconstitutional. * * *"

In Visco v. State ex rel. Pickrell, 95 Ariz. 154, 388 P.2d 155, we said:

"The state may constitutionally apply the 'regulated monopoly' theory in all of the instances in which it has previously been upheld. But all of these were 'common carrier' cases, no matter what definition of common carrier is adopted.

"But can the state expand its definition of 'common carrier' to include a business such as that of appellant which is essentially that of private carrier, and grant a monopoly? The answer under the Fourteenth Amendment to the Federal Constitution is emphatically 'No'. Frost Trucking Co. v. R.R. Commission, 271 U. S. 583, 46 S.Ct. 605, 70 L.Ed. 1101."

It is the duty of the courts to construe a statute in such a way as to preserve both its intention and its validity, if possible. State v. Smith, supra. We therefore construe the statute to permit the Commission to require a permit from a non-common carrier, and to permit the Commission to impose on such carriers only such conditions as are necessary to enable the Commission to carry out its duties with relation to the safety of the public, the condition of the highways, and revenue from taxes on vehicles and carriers, etc. This interpretation specifically excludes control over a contract carrier's rates, schedules, routes, etc., and specifically excludes the power to refuse a permit to such carrier for the sole reason that another carrier holds a certificate of convenience and necessity. To interpret the statute as going further than this would make it unconstitutional, since it would then, in the language of Frost v. Railroad Commission of California, 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101, be

" * * * very clear that the act, as thus applied, is in no real sense a regulation of the use of the public highways. It is a regulation of the business of those who are engaged in using them. Its primary purpose evidently is to protect the business of those who are common carriers in fact, by controlling competitive conditions. * * *"

We said in General Alarm, Inc. v. Underdown, 76 Ariz. 235, 262 P.2d 671:

"To be a public service corporation, its business and activities must be such as to make its rates, charges, and methods of operation a matter of public concern. It must be, as the courts express it, clothed with a public interest to the extent clearly contemplated by the law which subjects it to governmental control. Free enterprise and competition is the general rule. Governmental control and legalized monopolies are the exception and are authorized under our constitution only for the class of business that might be characterized as a public service enterprise. The theory is that the right to public regulation and protection outweighs the customary right of competition. If the public contact with a business is such that its necessities and convenience can be better served through governmental supervision and controlled monopoly, thereby eliminating customary competition, the state may exercise its police power to that end. *Such invasion of private right cannot be allowed by implication or strained construction. It was never contemplated that the definition of public service corporations as defined by our constitution be so elastic as to fan out and include businesses in which the public might be incidentally interested * * *.*" [Emphasis ours]

In Visco, supra, we quoted with approval the following language from Hertz Drivurself Stations, Inc. v. Siggins, 359 Pa. 25, 58 A.2d 464, 7 A.L.R.2d 438:

"There seems to be a mistaken notion in some quarters, because a monopoly for the service of a public need automatically carries with it liability to regulation and control, that, conversely, subjection to public regulation and control impliedly embraces the grant of a monopoly of the particular service. Nothing could be further from the law's contemplation. The stifling of competition through an exercise of the State's police power is never justifiable except that it be done, and actually be, in the public interest. As the highest attri-

bute of government (Salus populi est suprema lex), the police power must, at all times, be exercised with scrupulous regard for constitutionally guaranteed private rights. It can be properly exercised only in the public welfare; and, if exercised otherwise, the exertion will be stricken down as a perversion of the sovereign power. * * *"

We also said, in Visco, supra:

"* * * Every business in the state is subject to public control in some respects. This does not mean that because 'regulated monopoly' has been accepted as a method of regulating public service corporations that the state, either administratively or legislatively, can, without reason, grant monopolies in all businesses."

A case nearly identical with the instant case is Brink's Express Company v. Public Service Commission, 117 Pa.Super, 268, 178 A. 346. There, the Brink's Company's charter permitted it to provide armored-car service for persons or firms

"* * * with whom or which this corporation may specially contract, exclusively by separate individual contracts * * * and not in any way as a common carrier, nor as rendering or offering to render service to the public, * * *."

The record indicated that:

"* * * No two contracts are alike and it is not possible to make them uniform. The charge for the work is not dependent upon the distance traveled, the time consumed, nor alone upon the value of the articles carried. It is affected by the time when the work is to be done, by the character of the district in which it is to be done, and by the value of the article; that it is impossible to make a uniform tariff of rates.

*"The appellant * * * was actively engaged in soliciting customers * * * is prepared to handle all the new customers and the new business that it can get,* provided it can agree on proper terms."
[Emphasis ours]

The company furnished services other than transportation—such as providing coins for change, storing valuables in its safe, etc. It claimed that it could not separate one charge from the others. The court held the company not to be a common carrier, saying:

"Without similarity of service, without uniformity of rates, and necessarily a different contract for service in each case and with each customer, we do not think that the services rendered by an appellant come under the supervision of the Public Service Commission.

"Before appellant's business can come under the supervision of the Commission, it must be clothed with a public interest and affect a substantial part of the community at large. * * * In so far as the public is concerned, the commission regulation is designed to secure reasonable rates and adequate service. Where from the nature of the service this becomes impracticable, an attempt at regulation would be an idle gesture. The question of destructive competition is not involved unless the matter arises in connection with the exercise of a public service."

The corporation commission based its order for Continental to cease and desist on the ground that it

"* * * does not possess either a common carrier certificate of convenience and necessity or a contract carrier permit authorizing it to engage in the transportation of currency and valuables for hire."

The validity of the order depends upon whether the business of Continental is either that of a common carrier or a contract carrier. A comparison of the facts shows that Continental operates very much like Brink's in Brink's Express Company v. Public Service Commission, supra. It does not hold itself out as willing to haul for all potential customers without discrimination. It openly reserves the right to refuse to carry for any applicant even when it has equipment available. Many of its contracts are different from others. So long as it so operates, it cannot be classified as a common carrier. State v. Smith, supra; Arizona Corporation Commission v. Reliable

Transportation Company, supra; Brink's Express Company v. Public Service Commission, supra.

Furthermore, the business of Continental cannot be classified as that of a contract carrier. The business of Continental is that of protection and security. The general nature of its business is security for various purposes. The armored car is merely a part of the security provided for the protection of money and valuables. It includes protection in transportation to and from the cars. If the transportation were in one of the customer's cars and the driver accompanied by or followed by armored guards in another car, it could hardly be argued that it would be engaged in the business of either a common carrier or a contract carrier. The fact that the armored car is an added security afforded by Continental does not prevent its business from being classified as that of security service. We have held in other cases that where a party is engaged in a business other than that of a carrier, the fact that it uses the highways, at least to some extent, does not of itself make it a carrier. Quick Aviation Company v. Kleinman, supra; Killingsworth v. Morrow, supra; Visco v. State ex rel. Pickrell, supra.

The real test is whether the use of the highway is of such a nature that it is not a part of the other business and for that reason the public interest requires that it be regulated as a common carrier, or whether it is of such a nature that it must be classified as a contract carrier. We do not find that either test exists with respect to Continental as it is presently operated. The protective services are the main features of Continental's business. The armored car is merely a part of those protection features.

There will be some who will argue that our decision in the instant case puts it within the power of any carrier, by the simple device of making private contracts with an unlimited number, to secure all the privileges afforded to common carriers, without being subject to their duties and obligations. In the words of Frost v. Railroad Commission of California, supra:

"* * * It is enough to say that no such case is presented here, and we are not to be understood as challenging the power of the * * * Commission * * * whenever it shall appear that a carrier, posing as a private carrier, is in substance and reality a common carrier, to so declare and regulate his or its operations, accordingly."

We might add that we agree with the court in Motor Freight, Inc. v. Public Utilities Commission of Ohio, 120 Ohio St. 1, 165 N.E. 355, when it said:

"* * * It is not, however, cause for alarm or even regret that some contracts between citizens affecting transportation of freight still remain beyond the reach of governmental regulation." [Emphasis ours.]

Decision of the Court of Appeals vacated; decision of the Superior Court affirmed.

UDALL, V. C. J., and STRUCKMEYER, BERNSTEIN and LOCKWOOD, JJ., concur.